BERNARD J. CALLAHAN, Plaintiff-Appellant, v. L.G. BALFOUR *et al.*, Defendants-Appellees.

First District (5th Division)   No. 86—2138

Opinion filed February 3, 1989.—Rehearing denied March 2, 1989.

MURRAY, P.J., dissenting.

Arthur R. Ehrlich, of Goldman & Marcus, of Chicago, for appellant.

Arlene C. Erlebacher and Georgia L. Vlamis, both of Sidley & Austin, of Chicago, for appellees.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiff, Bernard Callahan (Callahan), brought this action against defendant, L.G. Balfour company (Balfour), for breach of contract and fraud. Balfour filed a counterclaim against Callahan for breach of contract. The trial court granted Balfour summary judgment on Callahan's breach of contract claim against Balfour. Callahan's claim against Balfour for fraud and Balfour's counterclaim against Callahan for breach of contract were jointly tried before a jury. The jury rendered a verdict against Callahan on his fraud claim and a verdict on behalf of Balfour on its counterclaim against Callahan for breach of contract. The trial court denied Callahan's motions for judgment notwithstanding the verdict and a new trial. Callahan appeals. We reverse.

Callahan's breach of contract claim against Balfour alleged that Balfour, a manufacturer of high school rings, diplomas and other school items, wrongfully terminated Callahan's employment with Balfour as a sales representative and that Balfour owed Callahan $186,686 in commissions and equity payments that Callahan earned as a sales representative. Balfour defended on the grounds that Calla-

han's employment contract was terminable at will, that Callahan accepted employment with Balfour's competitors within two years after he was discharged from Balfour, that a covenant not to compete in Callahan's employment contract prohibited him from doing so, and that a clause in the covenant not to compete allowed Balfour to retain Callahan's commissions and equity payments as liquidated damages for Callahan's breach of his employment contract.

Callahan's fraud claim against Balfour alleged that Balfour induced Callahan to continue working as a Balfour sales representative by promising Callahan that none of his accounts would be reassigned to other salesmen without his consent when Balfour knew at that time it made the promise to Callahan that Balfour had already reassigned three of Callahan's major accounts to two new sales representatives.

Balfour's breach of contract counterclaim against Callahan alleged that Callahan owed Balfour $36,431 for school rings and other school items which were advanced to Callahan by. Balfour.

The trial court granted summary judgment on behalf of Balfour on Callahan's breach of contract claim based on the covenant not to compete in Callahan's employment contract.

The pertinent facts adduced at trial on Callahan's fraud claim against Balfour and Balfour's breach of contract counterclaim against Callahan follow. In 1955, Callahan began working as a regional sales representative in Chicago for Balfour. In 1979, Balfour negotiated tentative employment contracts with prospective regional representatives Thomas Young and James Coleman. As a condition of accepting employment at Balfour, Young required the assignment to him of two accounts, the Morton East and Morton West High Schools, which were then assigned to Callahan. As a condition of accepting employment at Balfour, Coleman insisted that the Carl Sandberg High School account, which was also then assigned to Callahan, be assigned to him.

Balfour maintained at all times that it would not seek to reassign any of Callahan's active accounts or the inactive accounts upon which Callahan was "aggressively calling." On July 16, 1979, and September 15, 1979, and numerous other occasions, Balfour assured Callahan that none of his accounts would be reassigned without his consent. However, prior to September 15, 1979, Balfour reassigned Callahan's Morton East and Morton West accounts to Young and Callahan's Sandberg account to Coleman. Callahan had constantly called upon these schools in recent years, but had lost bids to sell rings to them. Balfour complained that Callahan's coverage of these schools was in-

adequate, but only after Balfour terminated Callahan's employment in March 1980. Within two years of his discharge from Balfour, Callahan worked for two of Balfour's competitors.

## I

Callahan first contends on appeal that the trial court erred in granting summary judgment on behalf of Balfour on counts II through V of Callahan's complaint. Counts II through V stated a claim of breach of the employment contract and sought damages totalling $186,686, which Callahan alleged he earned in commissions and equity payments. Balfour argued that Balfour was not liable to Callahan for the commissions and equity payments because Callahan breached a covenant in his employment contract not to compete by working for two of Balfour's competitors within two years after his discharge from Balfour, and therefore, by reason of a liquidated damages provision contained in the covenant not to compete, Balfour contended that Callahan forfeited his commissions and equity payments.

The covenant not to compete in Callahan's employment contract states:

> "In the event of the termination of this Contract for any reason, the Regional Representative agrees that for a period of two (2) years after such termination, he will not directly or indirectly, for himself, or as an agent of, or in behalf of, or in conjunction with any person, firm association, or corporation, sell or solicit orders for any other merchandise of the kind or character manufactured, or sold by Balfour within the territory that had been assigned to the Regional Representative. In addition to any equitable remedies to which Balfour may be entitled, Balfour may withhold as liquidated damages any sums that may be due from Balfour to the Regional Representative."

In *Donow v. Board of Trustees* (1974), 21 Ill. App. 3d 139, 314 N.E.2d 704, the court considered whether the defendant was entitled to withhold plaintiff's paychecks as liquidated damages. The defendant argued that the money withheld from the plaintiff's paychecks was liquidated damages. The defendant argued that the money withheld from plaintiff's paychecks represented a penalty for the plaintiff's violations of the university's traffic rules. The court stated:

> "First, there is no sum certain stipulated for specific offenses. *** Liquidated damages must generally be for a sum certain for a specified breach. [Citation.] Secondly, liquidated damages are usually considered to be paid in lieu of performance and are

not specifically intended to secure performance of the provisions. ***

Under the circumstances *** the assessments section is the equivalent to a penalty clause. The courts of Illinois lean toward this construction of provisions of this sort *** and rather treat such clauses as penalties which will not be enforced, the aggrieved party being able to recover actual damages only." *Donow v. Board of Directors* (1974), 21 Ill. App. 3d 139, 148, 314 N.E.2d 704.

The aforementioned covenant not to compete in the case at bar provides that Balfour "may withhold as liquidated damages any sums that may be due" to Balfour if the regional representative, Callahan, breaches the covenant. Callahan earned commissions on orders for rings which he sold for Balfour. Callahan also earned equity payments under a program which provided for the orderly transfer of territory from a retiring regional representative to a new regional representative with a percentage of the successor representative's commissions credited to the retiring representative's commissions. The commissions and equity payments could vary significantly depending on the number of orders the regional representative placed and the date the accounts were reassigned. Thus, the liquidated damages provision failed to state a sum certain to be forfeited. Additionally, the liquidated damages were not assessed in lieu of Callahan's performance, but were specifically intended to prevent Callahan from accepting employment with Balfour's competitors.

■ For a liquidated damages provision of a covenant not to compete to be enforceable, the damages resulting from breach of the covenant not to compete must be difficult to calculate and the amount of the fixed damages must be a reasonable forecast of the damage likely to occur. Both elements must be present. Otherwise, the provision will be construed as a penalty. *Bauer v. Sawyer* (1956), 8 Ill. 2d 351, 359.

The amount of commissions and equity payments Balfour owed to Callahan varied with the number of orders Callahan and his successor placed, rendering the damages difficult to determine. However, for the liquidated damages provision of the covenant not to compete to be enforceable, the amount of fixed damages which Balfour set forth in the covenant not to compete must also be a reasonable forecast of the damages likely to occur from Callahan's employment with Balfour's competitors.

In *Bauer*, the partnership agreement provided that when a physician left the partnership the remaining partners would purchase the departing physician's interest at a certain rate, which rate would vary

according to whether the physician's departure was voluntary or involuntary. The agreement further provided that a physician who breached the covenant not to compete would forfeit, as liquidated damages, any forthcoming sums due him. The court held that this liquidated damages provision was a penalty and therefore unenforceable. The medical partnership was required to remit to the departing physician his remaining interest in the partnership.

Likewise, in the instant case the variation in the amount of commission and equity payments which could enure to Balfour as damages rendered the liquidated damages provision ineffective as a reasonable forecast of the actual damages Balfour would suffer from Callahan's breach of the covenant not to compete.

Illinois courts encourage fair competition in business and abhor restraints on trade, and covenants in employment contracts not to compete are carefully scrutinized. A restrictive covenant may be held enforceable if the time limit and geographical scope are reasonable, if confidential information or trade secrets are involved, and if the restriction is reasonably necessary for the protection of a legitimate business interest. (*Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 713, 390 N.E.2d 68.) Only two such business interests have been recognized by the courts, a near permanent customer relationship and confidential information. *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 425 N.E.2d 1034.

Neither interest is present in the instant case. The evidence established that many salesmen competed to sell rings to schools that were assigned to Callahan and that a salesman who won at a school one year could lose the bid to a competitor at that school the next year. Balfour, therefore, cannot persuasively claim that it enjoyed a near permanent customer relationship with any school that was assigned to Callahan.

Balfour's claim that Callahan possessed confidential information for which Balfour required the protection of a restrictive covenant is fallacious. The names and addresses of Balfour's high school customers were generally known and readily ascertainable by Balfour's competitors and therefore certainly were not confidential. Neither were Balfour's prices confidential, since they were determined by the regional representative and could be obtained by anyone who contacted and asked the schools.

Neither can Balfour be said to have a protectable business interest in Callahan's familiarity with the high schools assigned to Callahan. A salesman's knowledge of or familiarity with customers is very similar to his personal skills and therefore cannot be considered

the property or protectable interest of his employer. *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 425 N.E.2d 1034.

■ Callahan contends that the covenant not to compete is overly restrictive and unduly burdensome. We agree. The geographic scope of the covenant, Chicago and seven surrounding counties, if enforced, would force Callahan to find a new home beyond the geographical area or forfeit his commissions in order to continue in the only profession he has known for 30 years. Such a result does not involve a minor inconvenience for Callahan, especially when balanced against the minuscule benefit attendant to Balfour. *McCormick v. Empire Accounts Service, Inc.* (1977), 49 Ill. App. 3d 415, 364 N.E.2d 420.

For the foregoing reasons, we conclude that the trial court erred in granting Balfour summary judgment on Callahan's breach of contract claim on the basis of the covenant not to compete in the employment contract. We therefore reverse the summary judgment.

II

Callahan next contends that the jury's verdict against Callahan on Balfour's counterclaim must be reversed because it is not supported by the evidence. We agree.

■ Generally, a jury verdict is entitled to great weight. A jury verdict must be reversed, however, if it is not supported by the evidence or if it is against the manifest weight of the evidence. (*Smith v. Chicago Limousine Service, Inc.* (1982), 109 Ill. App. 3d 755, 441 N.E.2d 81.) Moreover, when the facts are not controverted, they do not present an issue for the jury, and therefore, such a verdict is not conclusive. (*France v. Citizens Casualty Co.* (1948), 400 Ill. 55, 59.) If the jury verdict is based on a mistake or a failure to understand the evidence, then it must be reversed. *Illinois Building Authority v. Dembinsky* (1968), 101 Ill. App. 2d 59, 68, 242 N.E.2d 67.

■ Count II of Balfour's counterclaim alleged that Callahan owed Balfour $36,431 for rings and other items which Balfour advanced to Callahan. However, the record indicates that Balfour owed Callahan $17,561 in commissions. David Schlothauer, a witness for Balfour, testified that Callahan's accounts were designated "paid" for income tax reasons only and had been written off. Schlothauer did not work in Balfour's accounting department, however, and could not personally testify whether Callahan had not paid Balfour for allegedly outstanding invoices. Callahan's emphatic claim that he paid Balfour for all his invoices was undisputed and wholly supported by the evidence. We conclude that the jury verdict in favor of Balfour on its

counterclaim against Callahan was against the manifest weight of the evidence, and the judgment entered thereon is therefore reversed.

### III

Callahan lastly contends that the jury verdict on his claim of fraud against Balfour was also against the manifest weight of the evidence. We agree.

██ █ The elements necessary to prove a claim of fraud are a false representation of a material fact made by the defendant when he knew that the representation was false and reliance on the misrepresentation by the plaintiff. (*Duhl v. Nash Realty Inc.* (1981), 102 Ill. App. 3d 483, 429 N.E.2d 1267.) The record reveals that Balfour represented to Callahan that Callahan would not have to give up any of his accounts without his consent. On July 16, 1979, Balfour told Callahan that he could retain all of his active accounts and all of his inactive accounts upon which he was "aggressively calling." Callahan confirmed his understanding of this agreement by certified mail. Balfour did not dispute this evidence. These representations made by Balfour to Callahan were material and Callahan relied on them. Callahan reassigned a number of his accounts to other representatives, but retained Morton East, Morton West and Sandberg, all large accounts. Callahan testified that he would not have continued in Balfour's employ if he could not retain these three schools. The importance of these three accounts was further established by the testimony of Coleman and Young that they would not have accepted employment at Balfour if these accounts were not assigned to them.

The record reveals that Balfour knew that it had already reassigned Morton East, Morton West and Sandberg to Coleman and Young at the time that it promised not to reassign Callahan's accounts without his consent. Coleman testified that he received the Sandberg reassignment in the summer of 1979. Young testified that he negotiated an employment contract with Balfour in May or June 1979. Young also testified that he attempted to sell rings to Morton East and Morton West in early September 1979. On September 15, 1979, Young refused to sign an agreement which stated that no other accounts would be taken from Callahan because Young knew that he had been promised the reassignment of Callahan's Morton East and Morton West accounts. Balfour offered no evidence to contradict these facts, but instead defended on the ground that it had the right to reassign Callahan's inactive accounts upon which he was not "aggressively calling." The evidence clearly showed, however, that Callahan had aggressively called on Morton East, Morton West and Sand-

berg and submitted bids annually in their ring competitions.

We conclude that the facts adduced at trial on Callahan's claim of fraud against Balfour entitled Callahan to a verdict and that the trial court erred in denying Callahan's motion for judgment notwithstanding the verdict.

■■■ Balfour contended in its breach of contract counterclaim that Callahan owed Balfour $36,431. The jury, although finding in favor of Balfour on its counterclaim, awarded Balfour only $1,692. This fraction of the damages sought by Balfour indicates that the jury allowed Callahan a setoff for the money that Callahan alleged Balfour owed him. If a setoff was allowed, as is indicated by the amount of the award, then the jury apparently found for Callahan on his complaint. These contradictory and ambiguous findings by the jury indicate that the verdict was based on an error or mistake by the jury, and we therefore reverse the judgment entered thereon.

■■■ The appellee, Balfour, in this court asserts that the appellant, Callahan, has deliberately fabricated exhibits in the record on appeal. These assertions by the appellee are without substance.

After the record on appeal and Callahan's brief were filed in this court, Balfour filed an extensive motion to "strike plaintiff's fabricated exhibits" and to "correct the record on appeal." Callahan responded to Balfour's motion and stated, *inter alia*, that Callahan's present appellate counsel was not Callahan's trial attorney; that Callahan's appellate counsel had been hired to represent Callahan on appeal; that the exhibits which Callahan's appellate counsel incorporated into the record on appeal were furnished by Callahan's trial counsel; that Callahan's appellate counsel had no knowledge that the 80 exhibits which were furnished by trial counsel were not numbered the same as those exhibits which were introduced at trial; and that Callahan's appellate counsel emphatically denied any intent to deceive and apologized for the misunderstanding. Callahan's appellate counsel added that he made no objections to Balfour's motion to strike the inaccurate exhibits from the record on appeal since, with the exception of exhibit No. 73, he did not refer to them or rely on them in his brief on appeal. Callahan's appellate counsel explained that he mistakenly referred to an erroneously labeled exhibit No. 73 in Callahan's appellate brief and was therefore withdrawing all reference to it on appeal; and that exhibit No. 76, to which Callahan referred in his brief and which Balfour alleged was fabricated, is the true and accurate exhibit No. 76 used at trial, which Balfour's counsel did not dispute.

Appended hereto are the pertinent portions of the oral arguments of this cause during which Callahan's appellate counsel again ex-

plained the mistake of the misnumbered exhibits and reiterated that Callahan was not in any way relying for reversal upon any of these misnumbered exhibits.

The briefs and oral arguments centered on 15 exhibits, No. 52, No. 53 and No. 75 through No. 85. Although appellee's counsel urged that they were made part of the record on appeal, they were never actually admitted at trial. Appellant's counsel acknowledged during oral argument that the problem arose because he accepted the word of trial counsel that the exhibits had been properly admitted. As a consequence, we have carefully reviewed the complete record on appeal and the record's index (volume II, page 1), which shows when each exhibit was tendered and received. Accordingly, we have been able to sort out those exhibits properly before us.

Exhibits No. 52 and No. 53 were never received into evidence. Exhibits No. 73 through No. 76 were admitted and no complaint has been made that these documents were not genuine or properly a part of the record on appeal. It would appear that they are properly included in the record on appeal. Exhibit No. 76 was the last exhibit received into evidence as an exhibit of the plaintiff. There is no confusion as to exhibits No. 77 through No. 85 because they were not made part of the record.

For the foregoing reasons, it is apparent that Balfour's assertions that Callahan fabricated the exhibits upon which he relies on this appeal are utterly without merit.

For the reasons above stated we reverse the summary judgment in favor of Balfour and against Callahan on Callahan's breach of contract claim against Balfour and remand the cause for a new trial or other proceedings thereon. We reverse the judgment on the jury's verdict in favor of Balfour and against Callahan on Balfour's breach of contract claim against Callahan and remand with directions to the trial court to enter judgment on Balfour's breach of contract claim against Callahan in favor of Callahan notwithstanding the verdict. We reverse the judgment on the jury's verdict in favor of Balfour and against Callahan on Callahan's fraud claim against Balfour and remand Callahan's fraud claim against Balfour for a new trial and other proceedings thereon.

Reversed and remanded.

LORENZ, J., concurs.

## APPENDIX

"[A JUSTICE]: Counsel, I'm disturbed by a statement made in the appellee's brief *** and in your reply brief you do not respond to it at all. And her statement is that your record and your brief are replete with evidentiary fabrications and distortions of the record, and then she goes on to indicate that there are some fabricated trial exhibits, and many other things. And in your reply brief I would have thought that you would have responded to those charges, because they go to the heart of this case. Do they not?

[APPELLANT'S COUNSEL]: No, Your Honor.

[A JUSTICE]: And, why not? We go by what the record shows. And, if the record has been distorted, what opportunity do we have to uphold your theory of the issues?

[APPELLANT'S COUNSEL]: Well, I disagree that the record was distorted ***

[A JUSTICE]: Why didn't you say so in the reply brief?

[APPELLANT'S COUNSEL]: I had responded, Your Honor, in previous motions by the appellee's counsel, motions to strike parts of the record and to make certain corrections, and now that the motion that was made by the appellee regarding the issue of fabricated trial exhibits ***. As I explained in my response, I'd gotten all trial exhibits, or what I thought to have been the trial exhibits, from the trial attorney himself. There are over 80 exhibits involved here. I did not go through the exhibits, since I believed that what the other attorney gave me were in fact the exhibits for trial and those were the exhibits I gave to the clerk to put in the record on appeal. When the motion was filed and I filed my response to the motion as to making amendments, I saw he didn't object to it, although he did make response to the idea of fabrication. So, I did address that issue. Number two, there are only two exhibits out of all these allegedly fabricated exhibits which were cited, which were claimed to have been cited to, by myself in my brief. One, I believe was Exhibit Number 73, which I acknowledge in my motion, that I will not, of course, not hold this court to be bound to look at. The second point was Exhibit Number 76. Now, although the Exhibit 76 which I submitted to the clerk, which had been handed to me by the trial counsel, was not the correct exhibit, the Exhibit 76, which I refer to in my brief, was the true and accurate exhibit that was used at trial.

[A JUSTICE]: In this reply brief, the only thing, the only mistake you acknowledge making is the name of the school, and of course, that's a minor matter, but the school, the cite of those schools is separated by about 15 miles, so, but the name is Morton instead of Morton

Grove and so on, but that's the only thing that you acknowledge. Why didn't you, in your reply brief \*\*\*?

[APPELLANT'S COUNSEL]: Because I had done so previously in a response motion, which I could show Your Honors.

\* \* \*

I didn't want to belabor the issue once again in my brief because I, in motions and responses and in supplementary responses, I addressed those issues. That's why. It was raised again by counsel although I already responded to those charges in prior responses, prior motions as opposed to the brief itself. Have I cleared that up? I mean I understand what you're trying to say. I agree that the charges were serious, however, I don't believe the charges were true. I hope that's cleared up.

[A JUSTICE]: \*\*\* So then we have to go to the record and it's when we go to the record and we find that there are distortions in the record as distinguished from the briefs that makes us very unhappy. \*\*\* Hopefully, you can help us out this morning.

[APPELLANT'S ATTORNEY]: Well, if I could, as far as the exhibits which were true and accurate and which was not, there are only two exhibits which counsel claims were incorrect which I submitted which were actually cited in my brief. One was I believe was Exhibit 73, which I responded to in my response. Naturally, I'm not going to use that argument since it's not the correct one. Exhibit 76, while I submitted a different Exhibit 76, the Exhibit 76 I actually referred in my brief was in fact the true and accurate Exhibit 76. There is no problem with the exhibits.

[A JUSTICE]: It [Exhibit 76] was admitted.

[APPELLANT'S ATTORNEY]: The actual 76 Exhibit that I respond to in my brief was the one that was actually admitted. Okay, the one that I submitted to the record originally was not the correct one, it was not the one I was referring to in my brief.

[A JUSTICE]: Okay.

[APPELLANT'S ATTORNEY]: Those were the only two which were allegedly fabricated and I went ahead and cited to those in my briefs. And the only factual argument involved was confusing Morton with Morton Grove. However, there was no Morton Grove referred to, it was simply the Morton Schools. As I indicated \*\*\* Morton East or Morton West.

\* \* \*

[APPELLEE'S ATTORNEY]: I should address first the accusations I have made in my brief and my motion regarding fabrications of the record. But, in two respects \*\*\*

[A JUSTICE]: That's a serious charge.

[APPELLEE'S ATTORNEY]: I know it is. That's why I thought I should address it first. There are 15 exhibits that are a part of that record that is in front of the court that were never identified in the trial court, not even identified, let alone admitted into evidence. The numbers are 52, 53, and 73 through 85. And the only way I found those exhibits is when I started going through plaintiff's brief and saw that he had evidentiary citations for things that I did not remember any proof at trial. We came and checked off the record *** we started going through it and realized that plaintiff had documents which apparently trial counsel had once marked for himself with the intention of admitting, but never did introduce them or identify them at trial. *** I have the advantage in this case of having been trial counsel and being before you and knowing the record. I'm not accusing Mr. Erhlich [sic] of any malice. He came to this as an appellate matter and I have no reason to disbelieve what he says that the trial counsel was the one who gave him the wrong exhibits, but they are wrong nonetheless. *** The other point which the court is *** in this case you have appellate counsel who had nothing to do with the trial, but he takes the record as he finds it, and I would hope that he would present a true and correct record to the court.
***

[A JUSTICE]: What of these charges, Counsel? That's a very, very serious charge, falsifying records.

[APPELLANT'S ATTORNEY]: There are two responses to the defendant's motion.

[A JUSTICE]: Forget the responses. Does it prove that they were never in the record?

[APPELLANT'S ATTORNEY]: Yes. The exhibits that counsel referred to in her motion were not in the record. I acknowledged those points in my two responses.

[A JUSTICE]: How can we reverse when you have put 20 exhibits in the record which were never permitted ***

[APPELLANT'S ATTORNEY]: Because my arguments are not in any way based on any of those exhibits which were not admitted to the trial. Only two exhibits of all the exhibits that counsel said were not admitted at trial came from somewhere else. Only two of those that I cited to in my brief. One was Exhibit 73. And my response ***. The other was Exhibit 76, I submitted to the clerk, the record was not correct, the Exhibit 76 that I refer to in my argument was the true and accurate exhibit as admitted and ruled on at the trial court. So, there's absolutely nothing I'm citing to or relying on that was not

admitted at the court as an exhibit. My argument still stands with or without those exhibits. *** Judge, I'm trying to explain the mistake as to the evidence that was submitted. The mistake was that I took the other counsel's word and asked for the trial exhibits ***. I believed him to say that these were the trial exhibits. I didn't go through every single exhibit and take the transcript and go through all 800 pages of transcript.

[A JUSTICE]: Who prepared the record for appeal, you or the other counsel?

[APPELLANT'S ATTORNEY]: The record was there. The exhibits that I added to the record were trial exhibits or what I thought to have been missing trial exhibits.

[A JUSTICE]: The fellow who tried it downstairs said these are your trial exhibits.

[APPELLANT'S ATTORNEY]: No, I believe that they had some exhibits, they did not have all the exhibits. I went to get the missing exhibits from the other attorney who did the trial. I asked him for the exhibits. He said, 'Yes, Counsel. Here are the trial exhibits.'

[A JUSTICE]: More importantly, you're not relying on those in this appeal. It won't make a bit of difference.

[APPELLANT'S ATTORNEY]: Exactly.

[A JUSTICE]: *** When you found out that they were never in evidence, did you move this court to strike those exhibits?

[APPELLANT'S ATTORNEY]: They were already moved to be stricken by counsel.

[A JUSTICE]: Well, why didn't you do it?

[APPELLANT'S ATTORNEY]: Because I didn't know about it until counsel made her motion to strike. If I'd known earlier I would have done that. Once counsel made her motion and drew it to my attention I responded and I said, "You're right, these aren't the right exhibits. Disregard them.

[A JUSTICE]: This is nothing but an inadvertence on which you're not relying on on this appeal?

[APPELLANT'S ATTORNEY]: Exactly. I don't need any of those exhibits ***

[A JUSTICE]: *** I'm just wondering how it happens, that's all. What you're suggesting is that it was due to the negligence of your trial counsel?

[APPELLANT'S ATTORNEY]: Yes."

PRESIDING JUSTICE MURRAY, dissenting:

(1.) The trial court was entitled to have its decisions granting

summary judgment of Callahan's breach of contract claim on a record untainted by exhibits not introduced by Callahan. The jury's verdict on Callahan's counterclaim should not be reversed in my judgment on a record containing exhibits not introduced at the trial. In fairness to the trial court, jury and counsel, the trial court, not this appellate court, should have had the opportunity to amend the record and decide Balfour's charges of fabrication.

(2.) The majority opinion does not adequately explain its conclusion that the jury's verdict on the fraud charge was against the manifest weight of the evidence. The standard of proof in a case based on charges of fraud is "clear and convincing." (*Ray v. Winter* (1977), 67 Ill. 2d 296, 367 N.E.2d 678.) Even if one of the elements referred to in the majority opinion was proved by clear and convincing evidence, in order to sustain an action based on fraud, plaintiff must prove each element by such a standard. (*Cole v. Ignatius* (1983), 114 Ill. App. 3d 66, 448 N.E.2d 538.) Even with the record amended *sua sponte* by the majority, plaintiff's proof falls short of the well-settled standard in a fraud action. If the covenant not to compete was not enforceable or made moot by the jury's verdict, I believe plaintiff's contract claims may be barred by the jury's verdict on the fraud count. *Albers v. Community Consolidated No. 204 School* (1987), 155 Ill. App. 3d 1083, 508 N.E.2d 1252 (*res judicata* effect of jury verdict).

(3.) The court's ultimate remandment for further proceedings consistent with the views expressed in the opinion leaves the trial court and attorneys for both parties twirling in the air. Is the trial court to grant summary judgment on all issues decided by this court in favor of defendant and hold a hearing only on Callahan's alleged damages? Is the trial court to hold further hearings on the summary judgment? Should a new trial on all issues be held? If not, on what issues? At the very least the majority should have instructed the trial court and the parties as to what further proceeding would be consistent with its opinion.