**Frank YOCKEY, Plaintiff–Appellee,**

v.

**Margaret HORN, Defendant–Appellant.**

No. 88–1274.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1988.

Decided July 26, 1989.

Rehearing Denied Aug. 25, 1989.

---

Harlan Heller, C. Steve Ferguson, Brent Holmes, Harlan Heller, Ltd., Mattoon, Ill., for defendant-appellant.

Jerry Doyle Miller, Bowen & Miller, Olney, Ill., Robert E. Shaw, Musick & Mitchell, Mt. Vernon, for plaintiff-appellee.

Before WOOD, Jr., EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

WOOD, Jr., Circuit Judge.

Defendant-appellant Margaret Horn appeals a judgment entered against her in a diversity case initiated by plaintiff-appellee Frank Yockey for breach of contract. Horn and Yockey are former business partners who, upon the dissolution of their business relationship, entered into a settlement agreement intended to resolve all disagreements between the pair arising from their failed partnership. Yockey now alleges that Horn breached that settlement agreement; the district court agreed and Horn finds herself liable to Yockey in the amount of $50,000.

## I. FACTUAL BACKGROUND

Margaret Horn and Frank Yockey share what may mildly be termed an acrimonious relationship. Such was not always the case. Ten years ago, Horn and Yockey began a partnership in the oil business. All seemingly went well for a few years until the association between Yockey and Horn disintegrated in the fall of 1982. Extensive litigation related to the dissolution of the partnership ensued in both federal and state court.

Horn and Yockey eventually entered into a settlement agreement that terminated all pending litigation between the two of them.[1] In the aftermath of the partnership's dissolution, however, Horn, apparently finding Yockey's business practices to be questionable, contacted one of the partnership's investors, Paul Schrock, sometime in October of 1982. The precise substance of their conversations is not revealed in the record. Schrock did, however, eventually sue Yockey for losses arising out of his investment in the Yockey–Horn endeavor. The settlement agreement entered into by Yockey and Horn in July 1985 had no effect on the then pending Schrock litigation. The Schrock litigation, however, subsequently has had a great deal to do with the Yockey–Horn settlement agreement.

Yockey and Horn were each represented by counsel throughout the settlement negotiations leading up to their agreement; Horn was represented by Harlan Heller, Ltd., the same firm that represented

---

1. The agreement not only compromised Horn's suits against Yockey but apparently resolved two other suits, initiated by third parties, in which Yockey and Horn were adverse parties.

Schrock in his suit against Yockey. Under the terms of the written settlement agreement, Horn received slightly in excess of $126,000. In return, Horn made certain promises to Yockey including the following:

> Margaret Horn a/k/a Margaret Yockey ... agrees not to voluntarily participate in any litigation against Frank Yockey ... for events which have occurred from the beginning of the world to the date of the execution of this agreement.

A similar covenant runs from Yockey to Horn. The agreement also includes a liquidated damages clause:

> 7. *LIQUIDATED DAMAGE CLAUSE*
> Each of the undersigned do [sic] hereby agree that should either violate the terms or conditions of this Settlement Agreement by the institution of any lawsuit against the other or by the voluntary participation in any lawsuit by anyone against either of the undersigned, then in said event, each does hereby agree that the amount of damages sought by the other by reason of the institution of said lawsuit or voluntary participation in lawsuit by another may be difficult to ascertain and calculate, and each of the undersigned does agree that the damages shall be a minimum of Fifty Thousand Dollars ($50,000) in addition to attorney fees incurred by either of the undersigned in the defense of such a suit, and therefore, agree that should either of the undersigned violate the terms and provisions of this Settlement Agreement, then the liquidated damages sustained by reason thereof shall be a minimum of Fifty Thousand Dollars ($50,000) plus attorney fees and court costs.

Both parties signed the agreement, although at different times and places—Horn signed on July 12, 1985 before a notary public in Seminole County, Florida (Horn was by that time, and remains now, a Florida resident); Yockey signed before a Rich-land County, Illinois notary public on July 23, 1985.

Only one year after the settlement agreement was reached, Horn voluntarily gave an evidence deposition in the Schrock litigation at the offices of Harlan Heller, Ltd. Horn was not under a subpoena or any other court process. It appears that Horn notified the Heller firm that she intended to be in Illinois during July 1986 to visit her elderly mother. Brent Holmes, a partner in the Heller firm, asked Horn if she would give the deposition while in Illinois. Horn agreed.

During the evidence deposition Horn was questioned about her understanding of the nature of an evidence deposition. She stated that she understood that an evidence deposition was the same as testimony given in open court. Horn's evidence deposition was in fact received into evidence at the Schrock trial against Yockey. Schrock was ultimately awarded damages in excess of $111,000, based on Yockey's violation of several sections of the Illinois Securities Act. At oral argument before this court, however, Yockey's attorney conceded that the trial judge in the Schrock litigation did not rely upon Horn's evidence deposition at all in finding Yockey liable to Schrock.[2]

Yockey filed a two-count complaint in federal district court for breach of the settlement agreement against Horn on September 12, 1986. In Count I Yockey alleged that Horn had "violated her covenant not to voluntarily participate in litigation against" Yockey by giving the evidence deposition in the Schrock case in the absence of a subpoena or court order. Count I also enumerated in what way Horn's testimony had damaged Yockey, but in the end Yockey based his claim for damages not upon what he could prove as actual damages, but upon the liquidated damages clause of the settlement agreement. Count II of Yockey's complaint alleged that Horn

---

2. Horn's testimony was apparently offered only to prove the charge of common law fraud alleged in Count I of Schrock's two-count complaint against Yockey. Count II alleged liability based on violations of the Illinois Securities Act. According to Yockey's attorney, the judge specifically found no liability on the common law fraud claim.

had further violated the settlement agreement by contacting him by telephone and through the mails.[3]

Although Yockey made a general declaration of damage as a result of this alleged contact, no specific items of damage were detailed and no dollar figure was suggested in the complaint. Count II was eventually dismissed, but Count I was submitted to the district court judge upon agreed facts and questions of law.[4] The district court awarded judgment to Yockey in the amount of $50,000 on Count I. It is from this decision that Horn appeals.

**3.** Paragraph 9 of the settlement agreement provides:

> Margaret Horn and Frank Yockey do hereby agree that they shall make no further contact whatsoever with the other, spouse of the other, or any company in which either is an employee, owner or stockholder, including but not limited to any contact by telephone, telegram, personal writing or in any other manner.

**4.** Count II was not dismissed until this appeal was well under way. It appeared that both parties intended to have Count II dismissed early in the litigation but failed to accomplish the formal steps necessary to achieve that end. Decision was rendered on Count I, and Horn filed a notice of appeal therefrom to this court. The fact that Count II had been left in procedural limbo was not discovered until well after oral argument in the case, when the record on appeal revealed for the first time to the appellate court that the complaint had sounded in two counts, one of which was technically still pending before the district court. We requested that the parties submit memoranda of law concerning the question of this court's jurisdiction. Both parties in their opening briefs had agreed that the case was appealable to this court under 28 U.S.C. § 1291 as a final judgment. The unresolved status of Count II, however, meant that the district court's order appealed from was *not* a final and appealable order, and the district court had not certified the judgment under Fed. R.Civ.P. 54(b) as one which should be treated as final. In response to our concerns the parties produced separate memoranda of law which advocated basically the same position. They suggested that the district court belatedly issue a Rule 54(b) certification in the case—the notice of appeal, filed before certification, would be deemed to be timely under Fed.R.Civ.P. 4 (as interpreted by this court) and the appeal could go forward. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 760 F.2d 177 (7th Cir.1985). ("LCO"); *Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982); *Local P–171, Amalgamated Meat Cutters and Butcher Workmen of North America v. Thompson Farms Co.,* 642 F.2d 1065 (7th Cir.1981).

After careful consideration of this suggestion we rejected it. Those cases permitting belated Rule 54(b) certification to preserve an appeal involve cases where the district court either meant to or ought to have given Rule 54(b) certification before the appeal was filed but for one reason or another had not. In other words, those cases involved complex litigation, with multiple separate claims and/or parties. The present case, in contrast, involves only one party on each side and only one claim—did Horn breach the settlement agreement. Further, the parties claim that Count II was to have been dismissed. The record supports such a claim, for other than the complaint and the answer, Count II, either in name or substance, never appears again. This is not an appropriate case for even a *timely* Rule 54(b) certification. We therefore saw no justification for expanding the exception to strict compliance with the final judgment rule embodied in *LCO, Sutter,* and *Local P–171.*

On the other hand, we saw dismissal of the appeal as a triumph of form over substance—the case, if dismissed for lack of a final judgment, would simply reappear on another term's docket after the district court did enter a final judgment and a new notice of appeal was filed. Such a result aided no one. We therefore determined that if we granted leave to do so, the parties could petition the district court for revision of the existing order under Rule 54(b). (Or, in the alternative, the parties could petition for correction of clerical error under Rule 60(a). It was unclear to this court whether the failure to dismiss Count II was a mere clerical error—i.e., the parties had requested dismissal and the district court had inadvertently failed to mention it in the order—or was a more substantive error—i.e., the parties meant to ask for dismissal but forgot. The parties' decision to proceed under Rule 54(b) indicates that the error was of the latter type. *See generally Rivers v. Washington County Board of Education,* 770 F.2d 1010 (11th Cir.1985); *Windbourne v. Eastern Airlines, Inc.,* 479 F.Supp. 1130 (E.D.N.Y. 1979).)

Rule 54(b) permits the revision of judgments and orders by the district judge at any time until a final judgment is entered in a case. The plaintiff-appellee therefore petitioned the district court for revision of its "final" order to reflect voluntary dismissal with prejudice of Count II. The district court granted the motion and issued an order revising the original judgment to include the dismissal of Count II. The order also reiterated the disposition of Count I—judgment for the plaintiff for $50,000. The district judge also entered a new judgment form *nunc pro tunc.* There is thus a final and appealable order in this case within the meaning of 28 U.S.C. § 1291 and under Fed.R.App.P. 4(a)(2) the original notice of appeal filed for this case, despite its prematurity, is sufficient to permit us to go forward with this appeal.

## II. ANALYSIS

Horn raises three issues on appeal. First, she alleges that the district court incorrectly found that the giving of an evidence deposition in the Schrock litigation, without being under subpoena, constituted voluntary participation in litigation against Yockey in violation of the settlement agreement. Second, she contends that if her action did violate the settlement agreement then the covenant not to voluntarily participate in litigation is void and unenforceable as against public policy in the state of Illinois. Finally, Horn argues that the liquidated damages clause contained in the agreement is unenforceable as a penalty under Illinois law.[5]

### A. Voluntary Participation in Litigation

At the crux of the first issue is the meaning of Horn's promise not to "voluntarily participate in any litigation against Frank Yockey." Horn contends that this language does not encompass her giving of the evidence deposition against Yockey in the Schrock litigation; Yockey alleges that it does.

▮ We note initially that our standard of review on this issue is *de novo*, for "construction of the terms of a contract ordinarily presents an issue of law for the court." *Morris v. Flores*, 174 Ill.App.3d 504, 506, 124 Ill.Dec. 122, 124, 528 N.E.2d 1013, 1015 (2d Dist.1988).[6] The district court determined that Horn's unsubpoenaed testimony, given in the evidence deposition and offered at the Schrock trial against Yockey, constituted voluntary participation in litigation against Yockey within the plain meaning of those words as used in the settlement agreement. We agree. Although the phrase is not a term

of art in the law, the plain meaning of its component words provide guidance to its interpretation. *Black's Law Dictionary* 841 (5th ed. 1979) defines "litigation" as a "[l]egal action, *including all proceedings* therein." (Emphasis added.) To "participate" is to "take part; join or share with others." *The American Heritage Dictionary* 905 (2d ed. 1982). To do so "voluntarily" means to do so "from one's own free will." *Id.* at 1355. Putting these three terms together yields a very broad concept: to "voluntarily participate in any litigation" means to willingly and freely take part in any legal proceeding. This language is quite broad, but it is what the parties negotiated at the time of settlement; they included no qualifiers except that the litigation be "against" Frank Yockey. There is no question that Schrock's civil suit for damages was "against" Yockey. It is not for us to rewrite the language of the settlement agreement.

Given the breadth of the language used, it is clear that Horn's giving of the evidence deposition in the Schrock litigation against Yockey was a violation of the settlement agreement. Furthermore, Horn admitted in the stipulated facts submitted to the district court that she sat for the evidence deposition in the Schrock litigation of her own free will. She was under no legal compulsion, nor are there any insinuations of physical or mental duress. Admittedly, she did not instigate the giving of the evidence deposition, and thus she is not a volunteer in this narrower sense. Her ongoing relationship with the law firm of Harlan Heller, Ltd. and the fact that it was at the request of Brent Holmes, a member of the Heller firm, that she gave her testimony does not, however, alter or diminish

---

**5.** Both parties assume that Illinois law governs the interpretation of the contract between them. We see no reason to challenge that assumption.

**6.** The parties debated this issue in their briefs and at oral argument. At one point, Horn alleges that the district court erroneously treated this as a question of fact. A closer look at the record reveals that the district court believed the question to have a factual component—did Horn act voluntarily—and a legal one—did her

actions fall within the settlement agreement's terms. The significance of the dispute lies in the differing levels of review this court employs: *de novo* for questions of law, clearly erroneous for questions of fact or mixed questions of law and fact. In the end, such niceties are irrelevant here, for we would reach the same result on the issue of whether Horn's actions were a breach of the settlement agreement's express terms under any standard of review.

the voluntary character of her actions, as that word is broadly defined. True, Horn received questionable advice and guidance from her attorneys when they requested that she sit for the deposition without obtaining a subpoena, but that does not change the voluntary nature of her actions, nor does it relieve her of the obligations imposed upon her under the settlement agreement.

Horn further admitted that she understood the significance of an evidence deposition—that it is the same as testimony given in open court. Whatever else "participate in litigation against Frank Yockey" might mean, it encompasses testifying, in a case instituted by a former investor in the Yockey–Horn partnership, against Yockey for actions arising generally out of the same set of circumstances that led to the settlement between Horn and Yockey. Perhaps the language used would not stretch so far as to reach all imaginable situations. For example, if Horn had been subpoenaed and Yockey sued her for failing to contest the Illinois court's jurisdiction over her before sitting for the evidence deposition, or if the evidence deposition, although taken without a subpoena, was never introduced into evidence at the Schrock trial, we might reach a different result. In the present circumstances, however, there could not be a clearer case of voluntary participation in litigation. We therefore hold that Horn did "voluntarily participate" in litigation against Yockey in violation of their settlement agreement.

### B. Public Policy

■ Horn argues that if the covenant not to voluntarily participate in litigation against Yockey is construed to include her giving of the evidence deposition in the Schrock litigation, then that provision of the settlement agreement is unenforceable as against public policy. The district court rejected this argument; so do we.

Illinois law does refuse to enforce contracts deemed to be against public policy. For example, in *Marvin N. Benn & Assoc., Ltd. v. Nelson Steel & Wire, Inc.*, 107 Ill.App.3d 442, 63 Ill.Dec. 251, 437 N.E.2d 900 (1st Dist.1982) (*"Nelson"*), cited by Horn, the Illinois Appellate Court refused to enforce a contract between a law firm and another business under which the law firm was to provide not legal services but "business contacts" to its client. The court stated:

> An agreement is against public policy if it is injurious to the interests of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or is at war with the interests of society or is in conflict with the morals of the time.

*Nelson*, 107 Ill.App.3d at 446, 63 Ill.Dec. at 254, 437 N.E.2d at 903.

Although the court in *Nelson* did declare the contract at issue to be unenforceable as against the public policy of Illinois, the standards the court articulated for declaring a contract unenforceable are so arduous that undoubtedly very few contracts would not be enforced by Illinois courts as against public policy. The Yockey–Horn settlement agreement certainly does not rise to that level. One of the primary and fundamental provisions in a settlement agreement intended to resolve pending litigation is that the parties will cease and desist from pursuing the compromised claim against each other, both now and in the future. The clause in the Yockey–Horn settlement agreement is merely a variation on that theme. The parties promised not to directly sue one another for injuries arising out of their former business relationship, and also not to voluntarily participate in such litigation by any third person. Such an agreement is not against public policy per se. *See, e.g., Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1234 (7th Cir.1983) (promise by co-defendant corporate officer in settlement agreement with plaintiff not to voluntarily participate in litigation between plaintiff and remaining co-defendant corporation not a per se violation of officer's alleged fiduciary duty to assist in corporation's defense).

Most notably, the Yockey–Horn settlement agreement does not preclude partic-

ipation in litigation against the other party under subpoena or other court process; it therefore is not obstructive, as Horn alleges, of the fair and just administration of justice. *Schlosser v. Petherbridge, Lindgren & Zickert, Chtd.*, 97 Ill.App.3d 297, 52 Ill.Dec. 774, 422 N.E.2d 983 (1st Dist.1981), cited by Horn, is distinguishable from the present case. In *Schlosser,* the court refused to enforce the plaintiffs' alleged contracts with the defendant law firm. Years earlier the plaintiffs had lost a patent infringement case in which the defendant represented the prevailing party. An injunction issued, prohibiting the plaintiffs from continuing their infringement. The plaintiffs concocted a plan to evade the court's order, by transferring to a third party their interest in the corporation manufacturing the infringing product. This third party continued to infringe upon the patent until sued by the rightful holder, again represented by the defendant law firm. According to the plaintiffs, the law firm agreed to pay them a fee in return for their aid in pursuing this new infringer. When the firm failed to pay, the plaintiffs sued to collect under their services' contract. The court refused to enforce such a contract. The court stated that "a contract to perform services which would tend necessarily to influence improperly the administration of justice is unenforceable." *Schlosser,* 97 Ill.App.3d at 299, 52 Ill.Dec. at 775, 422 N.E.2d at 984.

This undoubtedly is a sound and good policy on the part of Illinois, but we see no danger that enforcement of the present contract undermines that policy. The plaintiffs in *Schlosser,* unlike Yockey, first created the problem that provoked the litigation and then offered to sell their services to the opposing side to resolve the problem. "It is rooted in Illinois law that one should not be allowed to benefit from his own wrongdoing. In view of their own wrongful conduct, any agreement by plaintiffs to aid [the defendant] in prosecuting a third party in the contempt proceedings would be void." *Schlosser,* 97 Ill.App.3d at 299, 97 Ill.App.3d at 775, 422 N.E.2d at 984. In the instant case, Horn, not Yockey, created the problem by failing to abide by the

terms of the settlement agreement she freely signed. Yockey is not profiting by his wrongdoing in the same sense that the plaintiffs in *Schlosser* were; he did not instigate Horn's giving of the evidence deposition and then seek damages from her under the settlement agreement. Horn made the choice to give the evidence deposition herself, or at least she made the choice entirely free from Yockey's influence.

Furthermore, the comparisons Horn makes between the Illinois statute, Ill.Rev. Stat. ch. 38, ¶ 32–1, that prohibits agreements not to prosecute or aid in the prosecution of criminals, and the agreement at issue are inappropriate. The language of the settlement agreement does not specifically forbid either party from aiding in a criminal prosecution against the other, and this case does not involve such a scenario. If Yockey were seeking to enforce the settlement agreement against Horn in such a context then we might have had a different case. This argument by Horn is nothing more than a legal red herring.

Nor does enforcing the contract undermine the interests of third parties, as suggested in Horn's brief. True, Schrock and other third parties have a legitimate interest in obtaining witnesses to testify to relevant facts. Horn has not shown, however, that the enforcement of the settlement agreement would compromise that interest. Admittedly the cost, in both time and money, of obtaining a subpoena to compel Horn's testimony at the evidence deposition might have been an annoyance, but it hardly rises to the level of undermining the judicial process or litigants' interest in obtaining witnesses and presenting relevant evidence. The enforcement of Horn's promise not to voluntarily participate in litigation against Yockey does not violate any public policy of Illinois of which we are aware.

## C. *The Liquidated Damages Clause*

■ Horn contends that even if her actions did breach the "no voluntary participation in litigation" covenant in the Yockey–Horn settlement agreement, and even if

that promise is not unenforceable as against public policy, Yockey is nevertheless not entitled to collect $50,000 from her because the liquidated damages clause is actually a penalty and thus not enforceable under Illinois law. Horn essentially contends that the $50,000 figure was not at the time of contracting and is not now a reasonable estimate of the damages that might flow from a breach of the "no voluntary participation in litigation" covenant.

Illinois law still recognizes the distinction between a liquidated damages provision and a penalty. *See Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir.1985) (collecting Illinois cases). Under Illinois law a two-prong test is used to evaluate liquidated damages clauses:

> To be valid under Illinois law a liquidation of damages must be a reasonable estimate at the time of contracting of the likely damages from breach, and the need for estimation at that time must be shown by reference to the likely difficulty of measuring the actual damages from a breach of contract after the breach occurs. If damages would be easy to determine then, or if the estimate greatly exceeds a reasonable upper estimate of what the damages are likely to be, it is a penalty.

*Lake River*, 769 F.2d at 1289–90 (citation omitted).

Where the amount set in a liquidated damages clause is not a reasonable estimate of the damages that might flow from the breach of a contractual promise, Illinois courts have refused to enforce such clauses on the grounds that they are penalties. For example, in *Callahan v. Balfour*, 179 Ill.App.3d 372, 128 Ill.Dec. 383, 534 N.E.2d 565 (1st Dist.1989), the court refused to enforce a liquidated damages clause appended to a non-compete clause on the grounds that it was a penalty. The liquidated damages clause at issue in *Callahan* permitted the nonbreaching party to withhold any commission payments owed to the breaching party as of the time of breach. Such a clause was deemed to be a clear penalty provision because "the variation in the amount of commission and equity payments which could enure to Balfour as damages rendered the liquidated damages

provision ineffective as a reasonable forecast of the actual damages Balfour would suffer from Callahan's breach of the covenant not to compete." *Callahan*, 179 Ill. App.3d at 378, 128 Ill.Dec. at 387, 534 N.E.2d at 569.

This court, applying Illinois law, reached a similar result in *Lake River*. We refused to enforce a liquidated damages clause which had the effect of not merely compensating the nonbreaching party but provided a windfall unrelated to any damages suffered. *See Lake River*, 769 F.2d at 1290–92.

The court in *Pav–Saver Corp. v. Vasso Corp.*, 143 Ill.App.3d 1013, 97 Ill.Dec. 760, 493 N.E.2d 423 (3d Dist.1986), however, reached a conclusion opposite that of *Callahan* and *Lake River*. *Pav–Saver* adopted the test stated in section 356 of the Restatement (Second) of Contracts to determine whether the amount of damages fixed for wrongful termination under a partnership agreement constituted liquidated damages or a penalty. Section 356, as quoted in *Pav–Saver* provides:

> (1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

143 Ill.App.3d at 1019, 97 Ill.Dec. at 764, 493 N.E.2d at 427. Furthermore, under Illinois law, "[t]he burden of proving that a liquidated damages clause is void as a penalty rests with the party resisting its enforcement." *Pav–Saver*, 143 Ill.App.3d at 1019, 97 Ill.Dec. at 764, 493 N.E.2d at 427. In the end, the *Pav–Saver* court found that the liquidated damages clause did not constitute a penalty because the amount was not unreasonable; actual damages would have been around $385,000—the liquidated damages clause provided for around $347,-000.

Neither of the parties cited any Illinois case that was sufficiently analogous to the present case to provide a clear indication of where, along the continuum between liquidated damages and penalties, the Yockey–

Horn agreement falls. Our own research failed to reveal a determinative precedent. We are therefore forced to fall back on general principles. We note that comment b under Restatement (Second) of Contracts § 356 states:

> The amount fixed [in a liquidated damages clause] is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches.... Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss.... *If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable.*

Restatement (Second) of Contracts § 356 comment b (emphasis added). Essentially, the Restatement creates a rule that favors the enforcement of liquidated damages clauses, if the amount estimated is reasonable either at the time of contracting or at the time of injury. If the nonbreaching party has suffered no damages whatsoever from the breach, the Restatement suggests that the clause will be unenforceable, no matter how reasonable the estimate of damages was at the time of contracting. The example given in the Restatement is a construction contract that contains a $1,000/day liquidated damages clause triggered by delay in completion of the contract. The contractor finishes 10 days late, which entitles the other party to $10,000 under the contract. There is proof, however, that even if the contractor had finished on time the property owner could not have opened his new facility for lack of a license. In such a case the clause would be unenforceable.

This example raises questions about the instant case, considering how disproportionate the amount awarded is to the actual damage that Yockey has suffered. Horn quite clearly breached the agreement by voluntarily sitting for the evidence deposition in the Schrock case. But even if she had not breached the agreement the result would have been the same. At oral argument Yockey conceded that he did not believe Horn had any valid defenses to the subpoena power of the Illinois courts. Thus, even if Horn had complied with the letter of the agreement, refusing to testify without a subpoena, she could have easily been subpoenaed and would have given the same testimony. Further, Yockey admits that the judge who entered judgment against him in the Schrock litigation expressly did not rely on Horn's testimony (in the form of her evidence deposition) in finding Yockey liable to Schrock. Horn's testimony went only to Schrock's common law fraud charge against Yockey, on which the judge decided in Yockey's favor. Yockey lost to Schrock on Schrock's statutory claim—Yockey violated the Illinois securities statute. Arguably, therefore, the "damages" Yockey suffered (his loss in the Schrock litigation) did not flow from Horn's breach of the agreement at all, but solely from Yockey's own wrongdoing. Viewed in this light it appears that Yockey has suffered no injury that could be attributed to Horn's breach of the settlement agreement.

This analysis fails to account for other types of damage that Horn's breach might have caused, however, and which fall within the injuries contemplated by the parties at the time of contracting. For example, Yockey's business reputation might have been significantly damaged in the eyes of investors or lenders when Horn, his former business partner, participated in litigation against him that arose out of their former business association. The damages flowing from such an injury would in fact be difficult to evaluate and would be a proper subject for a liquidated damages clause, so long as the parties' estimate is reasonable.

■ As we have noted, the Restatement provides that the reasonableness of the amount set in a liquidated damages clause is to be looked at as of the time of contracting and at the time of actual breach. If at *either* time the estimate is reasonable, the clause will be enforced. Restatement (Second) of Contracts § 356 comment b. *See also* J. Calamari & J. Perillo, *Contracts* § 14–31, at 642 (3d ed. 1987). Illinois law seems to conform to this model. *See Lik-*

*ens v. Inland Real Estate Corp.*, 183 Ill. App.3d 461, 463–64, 131 Ill.Dec. 829, 831–32, 539 N.E.2d 182, 184–85 (1st Dist.1989) (citing Restatement (Second) of Contracts § 356); *Pav–Saver*, 143 Ill.App.3d at 1018–19, 97 Ill.Dec. at 764, 493 N.E.2d at 427 (same). Although the amount set in this agreement, $50,000, seems large compared to the actual damages experienced, it is not disproportionate to what was anticipated, nor can we say that Yockey experienced no injury as a result of Horn's participation in the Schrock litigation. Because a great deal of damage might have been caused by Horn's breach of the agreement, the $50,-000 estimate was reasonable at the time the agreement was made. The liquidated damages clause in the settlement agreement between Yockey and Horn is therefore not a penalty under Illinois law and is thus enforceable.

## III. CONCLUSION

Despite the rather harsh result in this case, we have no choice but to uphold the district court's order. The judgment is AFFIRMED.