**ROSE MARINE TRANSPORTATION, INC., Plaintiff,**

v.

**KAISER ALUMINUM & CHEMICAL CORP., Calciner Industries, Inc. and ABB Trading (U.S.) Inc., Defendants.**

**ABB TRADING (U.S.) INC., Counterplaintiff,**

v.

**ROSE MARINE TRANSPORTATION, INC., Counterdefendant.**

No. 89 C 5321.

United States District Court, N.D. Illinois, E.D.

Sept. 10, 1990.

Terrance L. Smith, Smith & DeBonis, Chicago, Ill., for plaintiff.

Roger J. McFadden, Thomas J. Dillon, McFadden & Dillon, Alan S. Gilbert, Lorie A. Chaiten, Sonnenschein, Nath & Rosenthal, F. Thomas Hecht, Steven A. Levy, Hopkins & Sutter, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Rose Marine Transportation, Inc. ("Rose Marine") filed this action seeking a declaratory judgment that it had the right to seize property (more than $7 million worth of calcinated coke) that was stored on barges Rose Marine had leased to Calciner Industries, Inc. ("Calciner"). Rose Marine's claimed right to seize the coke was by way of liquidated damages for injuries that Rose Marine had purportedly sustained when Calciner allegedly breached their leasing contract. ABB Trading (U.S.) Inc. ("ABB"), which asserts that it is the rightful owner of the coke,[1] has intervened (1) to

---

1. Indeed one point of dispute between the parties is whether, as ABB vehemently maintains, it is the sole owner of the coke or whether, as Rose Marine would have it, ABB and Calciner are joint venturers or partners (so that the coke would be joint property available to satisfy a dispute on the Rose Marine–Calciner contract). Because that is an issue on which Rose Marine has indicated it will seek considerable discovery and because ABB believes that the issue is irrelevant to the resolution of this motion, ABB has agreed to be treated as the same entity as Cal-

obtain a declaration that Rose Marine had no right to seize the coke and (2) to seek conversion damages for the claimed wrongful seizure.

ABB has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56.[2] Because ABB has successfully demonstrated that there is no set of facts under which Rose Marine can properly assert its claim against the coke in the barges,[3] ABB's motion is granted.

### Facts

ABB purchases unprocessed or "green" coke, which it then has processed into calcined coke and sells to aluminum smelters around the world. ABB has a contractual relationship with Calciner by which Calciner performs the calcining process, then stores and transports the calcined coke before its delivery to ocean-going vessels for transportation to ABB's customers.

Until July 6, 1989 Calciner had a contractual relationship with Rose Marine, a company in the business of managing and operating marine vessels, by which Calciner leased the barges necessary to store and transport the calcined coke. That relationship between Calciner and Rose Marine was governed by a "Barge Supply and Service Agreement" (the "Agreement"),[4] and the terms of that Agreement provide the battleground for this lawsuit.

Under the Agreement Rose Marine was to supply a minimum of 30 and a maximum of 50 barges at a base rate of $175 per barge per day, subject to an escalator to be applied in certain circumstances. Calciner further granted Rose Marine a right of first refusal to supply barges in excess of the maximum if Calciner required more than 50 of them. Rose Marine was responsible for shifting services and fleeting (parking), as well as for making arrangements for towing, maintenance and inspections of the vessels that "were in dedicated service for [Calciner's] sole use for the purpose of storage and/or transfer of Coke

ciner for purposes of this motion *only*. On that latter subject, see n. 3.

**2.** Both Calciner and Kaiser Aluminum & Chemical Corp. ("Kaiser") have also moved for summary judgment. To that end they have adopted as their own all the arguments made by ABB in its memoranda. Thus whatever this opinion says as to the ABB motion, memoranda and arguments is equally applicable to Calciner and Kaiser.

**3.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Rose Marine (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). As with the issue referred to in n. 1, ABB has expressed its willingness—solely for purposes of the current motion—to grant arguendo many of the facts at issue in the underlying dispute. Thus the process of drawing reasonable inferences in Rose Marine's favor has been greatly simplified. But there should be no misapprehension on anyone's part that this Court's willingness to accept that procedure—a willingness attributable only to the obviously dispositive (and obviously sound) contention advanced by ABB—somehow converts this motion into what it clearly is not: a true summary

judgment motion (that is, a paper substitute for a full trial on the merits of all aspects of the litigation). What ABB asserts here is more accurately viewed as an issue-narrowing motion under Rule 16, which if successful may have the same effect as a successful Rule 56 motion—but which if unsuccessful is only a way station on the road to ultimate trial (see the Appendix to this Court's opinion in *Teamsters Local 282 Pension Trust Fund v. Angelos*, 649 F.Supp. 1242, 1252–53 (N.D.Ill.1986), together with the brief reference to the proposed but now withdrawn amendment to Rule 56 in *Spring Investments v. Chicago Corp.*, 1990 WL 119562, 1990 U.S.Dist. LEXIS 10488, at 2–3 (N.D.Ill.)). Fortunately for ABB and its codefendants, the current motion is unquestionably successful.

**4.** Rose Marine originally entered into the Agreement with Kaiser in 1983, and that initial version of the Agreement was amended by those parties in 1985. Later Rose Marine agreed that Kaiser could transfer to LaRoche Chemicals, Inc. ("LaRoche") certain rights and obligations under the Agreement, and thereafter Rose Marine could in turn transfer to Calciner certain of its rights and obligations under the Agreement. When this opinion refers to the Agreement, it refers to that document as amended in 1985. And to minimize the possibility of confusion stemming from the identity of the present parties to the document, any provisions quoted from the Agreement in this opinion will substitute "[Calciner]" for "Kaiser."

or other non-corrosive bulk materials" (Agreement Art. I.a).

In an April 19, 1989 letter Rose Marine informed Calciner that in its view the escalator clause required a new daily rate per barge of $188.04 as of April 1, 1989. Calciner did not automatically accede to that request. Instead Calciner continued to pay the $175 base rate while it considered Rose Marine's demanded increase. On July 6, 1989 Calciner sent Rose Marine a check for $38,155.04 to cover the claimed increase but explained that it was making the payment under protest because of its concern that the increase was not justified under the Agreement. That same day, before Rose Marine received the Calciner check or any notice of its having been sent, Rose Marine gave Calciner notice of the termination of the Agreement and proceeded to withdraw its barges from Calciner's use. Rose Marine also seized the approximately $7 million of coke that was then stored on the barges.

On July 7, after Rose Marine had refused to release the seized coke, ABB filed a complaint and moved for a temporary restraining order to recover the coke in the United States District Court for the Eastern District of Louisiana. Rather than proceeding with that injunction action the parties agreed, on an interim basis, that Rose Marine would release the coke for delivery to ABB customers as long as ABB posted a bond equal to the value of all the seized coke to be released. At this point all of the coke has been released, and the bond now stands at $7,213,071.41. ABB has continuing responsibility for premium payments on that bond.

Rose Marine has offered a plethora of reasons in support of its decision to terminate the Agreement [5]—Calciner's failure to make timely payment of the escalator fee, Calciner's late payment of the invoice for the period covering the second half of June 1989, Calciner's use of non-Rose Marine barges for storing coke while allowing the number of Rose Marine barges in use to dip below the minimum of 30 and Calciner's failure to give Rose Marine the right of first refusal to supply vessels in excess of the contractual maximum of 50. Without waiving its rights later to dispute those facts and also the legal conclusion that they assertedly support (that Calciner was in default under the Agreement), ABB is willing to grant Rose Marine all its factual allegations for purposes of the current motion.[6]

Thus the motion presents a simple question: Assuming that ABB and Calciner were joint venturers and that Calciner defaulted on its contract with Rose Marine so as to justify Rose Marine's termination of the Agreement, did Rose Marine have the corollary right to seize the cargo stored in its vessels as liquidated damages? Because that question demands a negative answer, ABB's motion must be and is granted.

### Contractual Lien?

■ Rose Marine attempts to justify its seizure of the coke by asserting a contractual lien.[7] Specifically Rose Marine relies on Agreement Art. X.b, which follows Rose Marine's stated right to terminate on default, as quoted in n. 5, with this language:

> Thereupon Rose shall retain as liquidation damages, free from any claim by [Calciner], any sums or other security which Rose holds as security for the

**5.** Agreement Art. X.b provides:
   In the event of a default by [Calciner], Rose at its option may declare this Agreement terminated and of no further force and effect by giving a written notice of termination to [Calciner] specifying the reason therefore [sic].

**6.** See n. 3.

**7.** Originally Rose Marine asserted three possible sources of a lien in support of the seizure: (1) the Agreement, (2) maritime law and (3) a Louisiana "common law" warehouseman's lien. Rose Marine has now abandoned the latter two contentions and focuses its efforts entirely on the existence of the contract (Rose Marine Mem. 2 n. 1). Indeed, this section of this opinion may well represent a needless step in the analysis, because the notion of a lien on property that is held to secure another obligation (and is thus limited by the amount of that obligation) may be viewed as mutually inconsistent with a claim of ownership of the property itself as liquidated damages for a breach of contract—which is what Rose Marine *now* asserts.

faithful performance of this agreement. In addition and together with or without the exercise of any other right Rose may retake the barges wherever the said may be found and if the barges be not then at the redelivery point hereinafter provided for, the expenses of transporting the barges to such redelivery point shall be for [Calciner's] account and the daily rate will run during the redelivery period and Rose shall have all such other liens and remedies as may be available to Rose at law or in equity.

On its face that provision does not create a lien or security in the *cargo* on the barges. Instead Article X.b grants Rose Marine the rights (1) to retake the barges themselves immediately upon default *and* (2) to retain any sums or other security that it holds as security for contract performance. Nowhere does the Agreement state (or even suggest) that Rose Marine "holds" the cargo stored in the barges at any given moment as "security" for contract performance—a necessary prerequisite to Rose Marine's right to assert a lien on the cargo under Article X.b. Of course the Article X.b language also preserves any liens that Rose Marine may have at law or at equity. But that language simply indicates that Article X.b does not spell out the *exclusive* remedies in event of default—the language cannot properly be read as stating that the Agreement itself creates such a lien.

Rose Marine Mem. 9 urges strenuously that to avoid interpreting the liquidated damages provision out of existence, Article X.b *must* be read as creating a contractual lien on the cargo. But that argument cannot withstand even passing scrutiny. All that the liquidated damages clause says is that if Rose Marine and Calciner were otherwise to establish a security arrangement (whether formal or informal) to provide Rose Marine with comfort as against a breach, Rose Marine would have a right to "retain" that security as liquidated damages. In the absence of a showing that some such other security arrangement was indeed in effect between the parties, there is simply nothing for Rose Marine to "retain" under the contract provision—a prob-

lem that Rose Marine surely cannot cure by urging this Court to recognize an untenable reading of clear contractual language at this late date.

Rose Marine's only potentially colorable argument in favor of finding a contractual lien is that the Article X.b language might mean something different in the barge leasing industry than it does to the ordinary individual reading the Agreement. Specifically Rose Marine points to the testimony of Rose Marine President Barry Rose ("Rose") in Rose Aff. ¶ 8:

> In the context of an agreement for the lease of barges where said barges are intended for the transportation or storage of a bulk commodity owned by the shipper, the term "sums or other security" which the barge operator "holds as security for the faithful performance of this agreement" refers, by custom, usage and technical meaning, to the barges and their cargo where the barge operator is responsible for maintaining, shifting, towing or transporting the barges.

As ABB R.Mem. 2–3 suggests, it is virtually impossible to overemphasize the self-serving nature of that testimony. Rose, as Rose Marine's chief executive and namesake, has everything (or at least $7 million) to gain from establishing that the Agreement created a lien on the cargo in the barges. But although that self-interest raises serious doubts as to the believability of Rose's testimony, such questions of witness credibility cannot properly be decided by this Court on a summary judgment motion. *Trans–Aire International, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1257 (7th Cir.1989), quoting *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988), elucidates that point:

> Trans–Aire evidently hopes to convey the impression that perhaps Fribley's testimony is not credible. However, we have held in the past that "[a] motion for summary judgment cannot be defeated by an opposing party's incantation of lack of credibility over a movant's supporting affidavit."

■ Obviously the reasoning that informs *Trans–Aire* and like decisions applies with equal force to the situation presented by this case: Mere arguments (or even persuasive incantations) as to the probable lack of credibility of a non-movant's affidavit, when offered in opposition to a summary judgment motion, cannot suffice to discredit that testimony and pave the way for success on the motion.[8] As ABB has offered no responsive evidence suggesting that those terms do not in fact carry the extraordinary meaning in the marine vessel leasing industry that Rose has ascribed to them,[9] this Court must and does find that a genuine issue of fact exists as to whether Article X.b granted Rose Marine a lien on the cargo stored in its barges. That, however, proves to be a wholly non-outcome-determinative fact for the reason discussed next in this opinion.

### Liquidated Damages or Penalty?

■ ABB did not expend any time or energy in attempting to contradict Rose's above-quoted affidavit statement because ABB realized that doing so was ultimately unnecessary—ABB R.Mem. 3 (footnote omitted) says:

> In any event, even if Rose Marine's "evidence" is accepted as true, Rose Marine cannot prevail here because the liquidated damages provision on which it relies is, as a matter of law, invalid.

That assertion adverts to the long-standing practice of Illinois state courts to distinguish between penalties and liquidated damages—enforcing only the latter and not the former.[10]

---

**8.** There are to be sure some cases that suggest a court's ability, in the context of a Rule 56 motion, to disregard evidence that is inherently incredible (see, e.g., *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted) ("If the evidence [favoring the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted") and *Johnson v. Washington Metropolitan Area Transit Authority,* 883 F.2d 125, 128 (D.C.Cir.1989)). To whatever extent such authorities limit the teaching of cases such as *Trans–Aire* and *Greenberg v. Puerto Rico Maritime Shipping Authority,* 835 F.2d 932, 936 (1st Cir.1987), the possibility of overriding a nonmovant's evidentiary submissions does not extend to rejecting Rose's statement in this case.

**9.** And even had ABB proffered conflicting evidence on the point, that very evidence would have created a classic issue of material fact preventing the entry of summary judgment on this ground. This topic cannot be left, however, without a brief reference to one distressing aspect of Rose Marine's briefing here. In support of the Rose affidavit, its Mem. 12 n. 29 cited *Welch v. Laux,* 13 Ill.App.2d 571, 142 N.E.2d 752 (4th Dist.1957) for this proposition:

> It is well settled that extrinsic evidence is admissible to ascertain the sense and meaning of language employed in an agreement ... where technical or trade terms are employed even though the same words may have ordinary meanings as well as a technical or local meaning.

This Court's law clerks are expected to read every case that a lawyer cites in his or her briefs, just as this Court reads every case that *it* cites in each of its opinions. But it turned out that the *Welch* case was reported (both in the official reporter and in N.E.2d) only in abstract, which sent this Court's law clerk on a time-consuming wild goose chase in search of the full opinion—first to the Chicago Bar Association library and then by telephone to the Appellate Court Clerk's office. When all those efforts proved unavailing, a series of telephone inquiries to counsel for Rose Marine (none of the lawyers in that office seemed to be willing to own up to having written the memorandum) ultimately disclosed that they had never read the case! That is frankly unpardonable as a matter of professional responsibility (indeed, none of the published headnotes in the two reporter volumes even hinted at the proposition for which counsel cited the case), as well as creating a real imposition on the time of people—this Court's law clerk and this Court itself—for whom time is the commodity in shortest supply. Most recently, as this opinion was being placed in final form, one of Rose Marine's lawyers called this Court's secretary to say that what had been done—that is, citing to an unread case—was all right because it appeared "only" in a footnote to the memorandum, not in the text! That notion is of course just as unacceptable as the substantive contention that Rose Marine can keep $7 million as liquidated damages for a readily ascertainable claimed breach about 1/200 that size in dollars.

**10.** In *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1288–90 (7th Cir.1985) Judge Posner engaged in an extensive and instructive economic analysis of the virtues of enforcing penalty clauses as against sophisticated promisors, but the Court of Appeals was ultimately constrained to follow the lead of Illinois courts (that case, like this one, was a diversity-of-citizenship case in which Illinois law provided the rules of decision) and therefore to strike the clause under consideration as an unenforceable penalty. As

As a matter of law[11] the Article X.b liquidated damages clause operates as a penalty and cannot be enforced. *Lake River*, 769 F.2d at 1289–90 teaches:

> To be valid under Illinois law a liquidation of damages must be a reasonable estimate at the time of contracting of the likely damages from breach, and the need for estimation at that time must be shown by reference to the likely difficulty of measuring the actual damages from a breach after the breach occurs. If damages would be easy to determine then, or if the estimate greatly exceeds a reasonable upper estimate of what the damages are likely to be, it is a penalty. See, e.g., *M.I.G. Investments, Inc. v. Marsala*, 92 Ill.App.3d 400, 405–06, 47 Ill.Dec. 265, 270, 414 N.E.2d 1381, 1386 ([2d Dist.] 1981).

In this case it clearly does not appear that damages in the event of a breach would be at all difficult to compute, nor does the Article X.b liquidated damages provision even purport to reflect a reasonable estimate of what the damages might likely be at the time of a breach.

ABB R.Mem. 5 ably demonstrates the ease of calculating damages in this situation by quoting Rose Marine's own response to a Calciner interrogatory regarding the actual damages that Rose Marine claims to have suffered because of Calciner's breach (Response to Calciner Int. Twelve, ABB App. Item 9 at 4–5):

> the loss of the benefit of the bargain of the contract, as well as attorney's fees and costs in prosecuting this action. [Rose Marine's] loss of the benefit of the bargain can be stated as either the present value of the difference of what [Rose Marine] would have earned under the contract, less what it will be able to earn in the market place. In other words, the difference in the contract

price and the market price discounted back to present value.[12]

There is absolutely no reason that the parties would not have assumed at the contract formation stage that such an obvious and customary damage measure would be applicable in the event of a breach. Their Agreement was for a fixed term at a fixed price, and it had no extraordinary features that would make anticipating potential damages a difficult endeavor.

Moreover, the liquidated damages provision utterly fails to undertake a reasonable estimate of whatever damages would likely result from a breach. It neglects entirely both the variable nature of (1) the cost of a breach over time (that is, along the continuum of contract performance) and (2) the day-to-day value of the cargo designated (it is assumed from Rose's affidavit) to serve as the liquidated damages.

Like the liquidated damage formula at issue in *Lake River*, 769 F.2d at 1290 (citations omitted), the Article X.b provision:

> is invariant to gravity of the breach. When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable. This case is within the gravitational field of these principles even though the minimum-guarantee clause does not fix a single sum as damages.

Here Rose Marine claims that no matter when a breach occurs, whether at the beginning of the Agreement's term when damages would be at their highest or near the end of the term when the amount of actual damages would have fallen off de-

---

no Illinois court has yet to pick up on Judge Posner's *Lake River* analysis, in this diversity case this Court is likewise bound to heed the dictates of the Illinois state court decisions.

11. *Lake River*, 769 F.2d at 1290 confirms that under Illinois law the distinction between penalty clauses and liquidated-damages clauses is a question of law and not of fact.

12. Rose Marine's response does continue by characterizing its asserted entitlement to the cargo "as liquidated damages under the contract provisions" as an "alternative assessment of [Rose Marine's] damages." But of course this Court need not buy that ipse dixit characterization.

cidedly, Rose Marine is entitled to precisely the same remedy—anything it can get its hands on. In either event the "liquidated damages" would bear no relationship (barring a merely fortuitous coincidence) to the actual injury suffered.

That degree of insensitivity to the amount of actual damages incurred is also rendered indefensible by the proper focus of Article X.b on securing performance of the Agreement, rather than on providing a sum certain to be paid as an alternative to performance. As Article X.b (emphasis added) states:

> Rose shall retain as liquidated damages ... any sums or other security which Rose holds *as security for the faithful performance* of this agreement.

In that respect *Stride v. 120 West Madison Building Corp.*, 132 Ill.App.3d 601, 605, 87 Ill.Dec. 790, 793, 477 N.E.2d 1318, 1321 (1st Dist.1985) (citation to *Scofield v. Tompkins*, 95 Ill. 190 (1880) omitted) articulates the long-standing principle:

> However, if the clause fixing damages is merely to secure performance of the agreement, it will be treated as a penalty and only actual damages proved can be recovered.

In addition to ignoring entirely the severity of the breach, the Article X.b liquidated damages clause fails to fix a sum certain to be paid in the stead of contract performance. It also fails to provide a formula that takes into account different variables relevant to determining a specific sum to be paid (as was also true in *Lake River*). Instead Article X.b establishes a totally arbitrary "catch as catch can" remedy by which the liquidated damages (according to Rose's reading) are exactly equal to, the value of the cargo that happens to be held in the barges at any given moment that Rose Marine chooses to terminate the Agreement. In light of the way the barges were used, constantly being filled and then emptied into ocean-going vessels, the value of the cargo could range from zero to $7 million or more from day to day—and on Rose Marine's view it would be wholly within its control at what point in the sequence it could "liquidate" its damages by

pulling the trigger. That complete lack of specificity in the amount making up the so-called liquidated damages highlights the penal (non-compensatory) nature of the provision.

In that respect this case bears a striking resemblance to *Callahan v. L.G. Balfour*, 179 Ill.App.3d 372, 128 Ill.Dec. 383, 534 N.E.2d 565 (1st Dist.1989). In *Callahan* the court struck as a penalty a provision allowing a corporation, upon a salesperson's breach of a covenant not to compete, to "withhold as damages any sums that may be due from [the corporation] to [the salesperson]" because (*id.* at 377, 128 Ill. Dec. at 386, 534 N.E.2d at 568):

> The commissions and equity payments could vary significantly depending on the number of orders the regional representative placed and the date the accounts were reassigned. Thus, the liquidated damages provision failed to state a sum certain to be forfeited. Additionally, the liquidated damages were not assessed in lieu of Callahan's performance, but were specifically intended to prevent Callahan from accepting employment with Balfour's competitors.

Precisely the same situation obtains in this case, and the Article X.b "liquidated damages" clause must be and is stricken as an unenforceable penalty.

### Conclusion

There is no genuine issue of material fact, and ABB is entitled to a judgment as a matter of law. Its summary judgment motion is therefore granted (and, as contemplated in n. 2, so are those of Calciner and Kaiser). In accordance with that ruling this Court:

1. declares that Rose Marine had no legal right to seize the coke stored in the barges;

2. declares that Rose Marine has no legal right to a bond from ABB securing the value of the coke; and

3. orders the bond to be extinguished.

What now remains for disposition are the respective damages claims of the parties—including ABB's counterclaim for Rose Marine's conversion of the coke via the asser-

tion of its later-abandoned lien claims and of its untenable liquidated damages claim. This action is set for a status hearing at 9 a.m. September 18, 1990 to discuss further proceedings in the case.