**ROSE MARINE TRANSPORTATION, INC., Plaintiff,**

v.

**KAISER ALUMINUM & CHEMICAL CORP., et al., Defendants.**

No. 89 C 5321.

United States District Court, N.D. Illinois, E.D.

Feb. 4, 1991.

Terrance L. Smith, Smith & DeBonis, East Chicago, Ind., for plaintiff.

Roger J. McFadden, Thomas J. Dillon, McFadden & Dillon, Chicago, Ill., for Kaiser Aluminum & Chemical Corp.

F. Thomas Hecht, Steven A. Levy, Hopkins & Sutter, Chicago, Ill., for Calciner Industries, Inc.

Alan S. Gilbert, Lorie A. Chaiten, Sonnenschein, Nath & Rosenthal, Chicago, Ill., for ABB.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

ABB Trading (U.S.) Inc. ("ABB"), one of the three defendants in this action brought by Rose Marine Transportation, Inc. ("Rose Marine"), has followed its success on Rose Marine's originally-asserted substantive claims [1] with a motion for sanctions under Fed.R.Civ.P. ("Rule") 11. ABB's motion stems from Rose Marine's pleadings in this action, which served to facilitate Rose Marine's unlawful seizure of calcined coke ("coke") that was owned by ABB and was located on barges that Rose Marine had leased to co-defendant Calciner Industries, Inc. ("Calciner"). For the reasons stated in this memorandum opinion and order, ABB's motion is granted.

At the outset it is important to separate out what ABB is *not* claiming in the current motion from what it is. At least at this stage of the litigation, ABB is not complaining about its having been sued *at all* by Rose Marine.[2] Instead it challenges

---

1. This Court's September 10, 1990 memorandum opinion and order (the "Opinion," 758 F.Supp. 1218) granted ABB's motion for summary judgment on those claims. Any further reference to that decision will take the form "Opinion at ——," identifying the F.Supp. page number.

2. This Court has held, in response to ABB's Rule 12(b)(6) motion to dismiss Rose Marine's most

recent First Amended Complaint ("FAC") in its entirety, that the FAC survives because there is enough of a factual issue as to whether ABB could be linked as a joint venturer with Calciner so as to render ABB potentially liable for Rose Marine's money claims. It remains a potential question for the future whether that position

the propriety of Rose Marine's having proceeded with filings that involved the confiscation of many millions of dollars worth of ABB's property just to obtain satisfaction of a claimed indebtedness from Calciner of about one-half of one percent of the value of the seized property.[3]

### Background

In accordance with the modified terms of a Barge Supply and Service Agreement (the "Agreement") that—after mesne transfers—ended up documenting a relationship between Rose Marine as lessor and Calciner as lessee, in mid-1989 Calciner was using a number of leased barges owned by Rose Marine to carry coke belonging to ABB. When Rose Marine and Calciner had a falling out as to the terms of the Agreement, three critical events took place on the same day, July 6, 1989:

1. Calciner sent, via Federal Express, a check to Rose Marine for $38,155.04—the full amount that Rose Marine had claimed was past due to it under the Agreement.

2. Rose Marine terminated the Agreement because of Calciner's claimed defaults and seized a number of the leased barges containing more than $7 million worth of coke—not merely as security for what was then owed to Rose Marine, but assertedly by way of its somehow having acquired outright ownership of all the coke as liquidated damages.

3. Rose Marine filed this lawsuit against Calciner and Kaiser Aluminum and Chemical Corp. ("Kaiser," which was the original party to the Agreement with Rose Marine), claiming that Calciner had breached the Agreement, therefore (sic)

entitling Rose Marine to keep ABB's coke as such liquidated damages.

As soon as it learned of Rose Marine's seizure of the coke, Calciner demanded (1) the coke's release and (2) Rose Marine's performance of the Agreement. Rose Marine refused. On the very next day (July 7) ABB filed suit in the United States District Court for the Eastern District of Louisiana, seeking a temporary restraining order ("TRO") to recover the seized coke. Because it was subject to the immediate pressure of having to deliver the coke to the waiting vessels of its own customers, ABB had to enter into an agreement in that Louisiana litigation to post a bond equal in value to all the coke released by Rose Marine. In opposition to ABB's motion for the TRO, Rose Marine took the position that only this Court (and not the Louisiana District Court) could resolve the right to possession of the coke because of the "first to file" rule and the one-day priority of this lawsuit. As part of its undertaking to obtain release of the coke, ABB consequently agreed to intervene in this action and submit to this Court's jurisdiction.

Meanwhile, in this action Rose Marine has advanced four kinds of justification for its seizure of the coke:

1. As already stated, its Complaint asserted Rose Marine's entitlement to the coke as "liquidated damages" for Calciner's alleged breach of the Agreement.

2. Rose Marine also appeared from its Complaint to be claiming some kind of contractual lien over the coke under the Agreement—although the Complaint was somewhat fuzzy in that respect.[4]

---

asserted by Rose Marine, if it were ultimately to be defeated, would also prove not to have been sufficiently colorable to meet the objective good faith standard of Rule 11.

**3.** As the later discussion will reflect, Rose Marine now characterizes its money claim in a dramatically different way that would up the ante to almost twice the $7 million value of the seized coke. But what is referred to in the text (some $38,000) is the *only* amount that could fairly be labeled as *past due* from Calciner to Rose Marine (and hence even arguably lienable)

at the time of the coke's seizure, even under Rose Marine's version of the relationship.

**4.** Complaint ¶¶ 15–16 effectively asserted that Rose Marine had some sort of security interest in the *contents* of the leased barges, even though nothing in the original or amended Agreement with Kaiser said that, and even though the rights that the Agreement gave to Rose Marine in case of default by Kaiser (and hence by Calciner as Kaiser's successor) were simply that Rose Marine "may retake the *barges* wherever the said may be found" (emphasis added)—without making any reference to the barges' *con-*

3. Rose Marine also asserted that "it has a lien on the goods transported and stored on RMT [Rose Marine] barges under maritime law since the RMT barges were operating under contract in commerce and navigation" (Rose Marine's Amended Ans. to Calciner's Int. Two).

4. Finally Rose Marine said that it "has a warehousemen's lien on the goods stored in the RMT barges pursuant to the common law of the State of Louisiana" (*id.*).

Indeed, in response to the repeated requests by ABB's counsel as to just how Rose Marine could assert a lien on ABB's coke, Rose Marine's lawyer Terrance Smith ("Smith") wrote a letter on April 12, 1990 saying that the just-referred-to Amended Answer to Calciner's interrogatory—an answer that asserted a contractual security interest, a maritime law lien and a state law warehousemen's lien—was self-explanatory and needed no elaboration.

After its intervention here, ABB filed a motion for summary judgment against Rose Marine, accompanied by an extensive supporting memorandum and materials. In response Rose Marine completely disavowed its prior assertion of a maritime law lien or a Louisiana state law lien (Rose Marine Mem. 2 n. 1), choosing instead to rely only on (1) its claimed rights to liquidated damages and (2) a contractual lien under the terms of the Agreement.

On September 10, 1990 this Court issued the Opinion granting ABB's motion for summary judgment. It found that Rose Marine's proposed reading of the Agreement and its assertions as to its claimed remedies were wholly untenable in light of established Illinois law, so that Rose Marine had no right to have seized the coke or to have obtained a bond from ABB securing the value of the coke.

*Rose Marine's Current Position*

Rose Marine has responded to ABB's motion with a creative example of revisionist history. Its memorandum[5] says at pages 1–2:

Rose Marine on the date it filed suit in this court was faced with the following facts, each constituting a separate and distinct breach of its barge contract....:

1. Calciner/ABB was $95,900.40 delinquent in paying the flat fee due under the June invoices.

2. Calciner/ABB had failed to pay the escalation amounts due under the contract in the amount of $38,155.04.

3. Calciner/ABB was returning 14 barges as a result of a phony force majeure notice.

4. Calciner/ABB had leased 15 barges from a Rose Marine competitor in violation of the contract.

Rose Marine knew that it had 11 years, 3 months remaining on an economically advantageous contract and that Calciner/ABB, by breaching the contract caused Rose Marine to suffer a minimum of $12,611,333.00 in damages.

Rose Marine's post hoc characterization of what happened is that it then concluded that "Calciner/ABB" (whom Rose Marine lumps together as a single party under its joint venture theory) was no longer dealing in good faith under the Agreement, so that on July 6 Rose Marine terminated the Agreement and (RM Mem. 2):

On that same day, Rose Marine filed this suit seeking a judicial determination of the validity of the liquidated damages clause found in the contract in Section X(b).

According to Rose Marine, ABB's wounds were somehow self-inflicted because it

---

*tents.* Calciner quite understandably included, among its discovery requests to Rose Marine, this Int. No. Two:

State the basis for RMT's [Rose Marine's] contention in Paragraphs 15 and 16 of the Complaint that RMT possessed a security interest in the cargo contained in the barges supplied by RMT to CII [Calciner].

Rose Marine's Amended Response to that interrogatory then set out the two theories next described in the text.

5. Rose Marine's memorandum, "Response of Plaintiff to Petition for Rule 11 Sanctions," will be cited "RM Mem.—" in this opinion. ABB's opening and closing memoranda will be cited "ABB Mem.—" and "ABB R. Mem.—," respectively.

"voluntary [sic] intervened as a defendant in this action" (*id.*). And all that Rose Marine did, it says, was to tender the issue to this Court for a declaration of rights—as it had every right to do.

### From Fantasy to Reality

But the *facts*, as contrasted with Rose Marine's retroactively expurgated version, are startlingly different. If all that Rose Marine had been seeking were to hold the coke as *security* for the amount that Calciner owed it, Calciner's immediate payment of the $38,155.04 (sent on July 6 and, if the Federal Express TV commercials are to be believed, presumably received by Rose Marine on July 7) would have released ABB's $7 million worth of property just as immediately.[6] Nor can Rose Marine now contend that it was merely trying to get a judicial declaration of its *right* to recover liquidated damages, given the fact that it launched the proceeding by a physical seizure of the millions of dollars of property involved—the legal equivalent of shooting first and asking questions later.[7]

It requires nothing more than the application of well-established and straightforward Rule 11 doctrine to dispatch the three contentions that Rose Marine now advances to escape liability under that Rule. They will be dealt with in the same order as set out in Rose Marine's Memorandum:

1. Rose Marine's "treatment of the liquidated damages provision in the Amended Barge Agreement" (RM Mem. 2–7);

2. Rose Marine's assertion of its purported lien claims (RM Mem. 7–12); and

3. Rose Marine's time pressure at the time that it filed the original Complaint (RM Mem. 12 and the affidavit of its outside corporate counsel Carson Veach ("Veach")).

Of course the legal principles to be applied to those contentions are well marked out by our Court of Appeals. *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 932 (7th Cir.1989) (en banc) (citation omitted) delivers the familiar message that the Rule 11 responsibility, under which a pleader must conduct an adequate prefiling investigation, carries with it that party's duty to avoid needless legal costs and delay by doing its homework before and not after filing:

> Counsel may not drop papers into the hopper and insist that the court or opposing counsel undertake bothersome factual and legal investigation.

> Rule 11 is not a fee-shifting statute in the sense that the loser pays. It is a law imposing sanctions if counsel files with improper motives or inadequate investigation. Under the American Rule on the allocation of attorneys' fees, each side bears its own expenses. Rule 11 ensures that each side really *does* bear the expenses of its own case—that the proponent of a position incurs the costs of investigating the facts and the law. Its focus is ex ante (what should have been done before filing) rather than ex post (how things turned out).

And where the party instead thrusts the burden on its adversary to research and demonstrate the poverty of the proponent's position, the sanction that is made mandatory by Rule 11 ("the court ... *shall* impose ... an appropriate sanction") may readily encompass the cost—the legal fees—that the adversary has been forced to incur (*id.;* and see, among the flood of

---

**6.** Though the earlier-quoted language from RM Mem. 1–2 also refers to Calciner's claimed delinquency in paying the flat fee under the Agreement, Rose Marine's bona fides in that respect are open to serious question. Over the entire period of the Agreement those payments had regularly and quite consistently followed a timetable that did not adhere to what was set out in the Agreement—simply the product of Calciner's in-house processing and payment arrangements. Rose Marine was in precisely the same well-established and universally-known legal position as the lessor of real estate who, having accepted belated rent payments over a period of time, cannot—at least without a warning that no future tardiness will be tolerated—use another late payment as the predicate for terminating the lease or otherwise forfeiting the tenant's rights.

**7.** See n. 9 for the obvious answer to any possible argument by Rose Marine that it did only what it had to do to avoid the potential dissipation of the property that represented its claimed liquidated damages.

other cases so holding, this Court's opinion in *Fleming Sales Co. v. Bailey*, 611 F.Supp. 507, 519 (N.D.Ill.1985)). This opinion turns, then, to Rose Marine's claimed justifications for its filings.

### Liquidated Damages Provision

■ As RM Mem. 3 would have it:

First, the attorneys for Rose Marine had the duty and obligation to obtain the Court's determination as to the validity of the liquidated damages provision.

Its lawyer further says (1) that the burden was on ABB and Calciner to negate the enforceability of the liquidated damages provision and (2) that the provision was not so clear as to make Rose Marine's reliance on it "frivolous" in the legal sense.[8]

But even apart from the false picture that is suggested by Rose Marine—one of its simply inviting this Court's attention to a legal question, as contrasted with the reality of Rose Marine's simultaneous self-help physical seizure of millions of dollars of coke—those arguments do not survive scrutiny. Parties and their lawyers do not have an obligation to seek court intervention for *every* legal question they may have—lawyers (like judges) have gone to law school, have full access to legal authorities and are presumably armed with powers of legal analysis. Two compelling facts give the lie to Rose Marine's "we were only asking the court's legal advice" position:

1. As Opinion at 1224 reflects, squarely applicable and recent Illinois case law (which reconfirms a principle more than a century old in Illinois juris-

prudence) *specifically* states that even a clause that is labeled as one for liquidated damages, if it is included "merely to secure performance of the agreement," will be treated as a penalty and hence as unenforceable in liquidated-damage terms (see, e.g., *Stride v. 120 West Madison Building Corp.*, 132 Ill. App.3d 601, 605, 87 Ill.Dec. 790, 793, 477 N.E.2d 1318, 1321 (1st Dist.1985); *Callahan v. L.G. Balfour*, 179 Ill.App.3d 372, 377, 128 Ill.Dec. 383, 386, 534 N.E.2d 565, 568 (1st Dist.1989)). And that case law's language tracks *directly* with the express language of Agreement Art. X.b (emphasis added):

Rose shall retain as liquidated damages ... any sums or other security which Rose holds *as security for the faithful performance of this agreement.*

When the client comes to the lawyer with a document and asks "What are my rights?" the lawyer who is confronted with such unequivocal and firmly established law has the affirmative responsibility *not* to advise the client to seize the property as liquidated damages and *not* to assert the right to do so in a contemporaneous pleading that imposes major damage on the owner of that property.[9]

2. Even more important, even if the argument as to the meaning and effect of the liquidated damages clause could pass the objective good faith test of Rule 11 (as it could not in fact), Rose Marine still had to engage in impermissible boot-

---

**8.** This last is not the way that Rose Marine itself has put the matter—it rather speaks the language of this Circuit's Rule 11 case law.

**9.** Veach Aff. ¶ 4 (*discussed later in the text*) includes this as one of the conclusions that he and his partners reached after their prefiling "intensive effort":

[W]e could not rule out the real possibility that a court would conclude that Rose Marine Transportation's only remedy was to terminate the contract and seize the cargo and that therefore the client should consider a declaratory judgment action. The client then made the business decision to seize the cargo and file a declaratory judgment action.

That carefully-couched statement really does not do the job of justifying either the so-called

"real possibility" or—even more fundamentally—Rose Marine's "business decision" to take the drastic action of a prefiling seizure of the coke. If despite the unusual clarity of the established case law (with its language word-for-word matching the contract at issue here) the lawyer believed that the question could fairly be tendered to the court for resolution (a highly questionable assumption, indulged arguendo for purposes of this footnote only), the *most* that could be done by the lawyer and client in good conscience would be to present the issue for a judicial declaration and perhaps simultaneously to seek a TRO or preliminary injunction to keep the cargo in place in the meantime—but once again, *not* to seize that property first with no real legal support for doing so.

strapping to bring that liquidated damages provision into play at all. By the Agreement's own definition, the purported liquidated damages extended only to "any sums or other security which Rose holds as security for the faithful performance of this agreement"—and *not a word* in the Agreement purports to confer on Rose Marine any security interest in the barges' cargo, the coke.[10] Opinion at 1221 demonstrates that beyond question. Because Rose Marine nonetheless purported to create a gloss on the Agreement's language through the affidavit of its President Barry Rose, the Opinion eschewed a decision on that ground because of the strength of the point already discussed in the preceding numbered paragraph. But it should not be forgotten that a liquidated damages provision must apply to the property at issue to begin with, before its enforceability can become a pertinent question at all.[11]

### Lien Claims

■ Rose Marine Mem. 8–9 now professes that the only lien claim that it really *asserted* in this litigation was contractual, even though it also *believed* that it had a maritime lien and a warehousemen's lien as well. So it says that it cannot be faulted just because ABB "chose" to attack the latter two types of lien claims in its summary judgment motion.

That is extraordinarily disingenuous. As has already been said, Complaint ¶¶ 15–16 left room for real uncertainty as to what Rose Marine regarded as the precise source or sources of its asserted lien rights.[12] Calciner asked that question of Rose Marine specifically in its Interrogatory Two, and Rose Marine answered by saying that the Complaint language "spoke for itself" but *also* by saying that Rose Marine had a security interest under the Agreement *and* also via maritime and warehousemen's liens—the two kinds of lien that it later disavowed only after ABB had gone to the trouble and expense of demolishing such claims in its Rule 56 opening gun.

Indeed, if there were any possible question on that score (and there is not), it would be dispelled by the exchange of correspondence that took place between ABB's counsel and Smith as Rose Marine's counsel *before* ABB proceeded with its summary judgment motion: the April 6, 1990 letter from ABB's lawyer (Ex. B to this opinion [13]) and the April 12 response from Smith (Ex. C). At this point Rose Marine cannot in good faith say "We didn't mean it" in an effort to escape liability for what ABB *had* to do in order to meet the legal theories that Rose Marine had announced it was invoking.[14]

---

**10.** Again it will be recalled that as soon as it was challenged, Rose Marine abandoned its clearly frivolous contention that such a security interest—any lien right—was conferred upon it from any source outside of the provisions of the Agreement itself.

**11.** For two independent reasons, then, it is thus a total irrelevancy—a red herring—as to just where the burden of proof to demonstrate the validity or invalidity of a liquidated damages provision may rest.

**12.** It will be remembered that the Complaint said that Rose Marine had taken possession of the cargo pursuant to the Agreement. But Agreement Art. X.b, as already stated and as expanded later in this opinion as well, did not itself even pretend to identify what property Rose Marine held as security. Thus the Complaint as it was framed left that matter an open question.

**13.** There is no "Ex. A" to this opinion. Because Ex. B and the next-mentioned Ex. C were part of the material that ABB submitted on the current motion bearing those designations, this Court has simply chosen to photocopy those documents as is (exhibit designations and all) rather than relabeling them.

**14.** RM Mem. 11 acknowledges frankly that it knew when suit was first filed, based on prior research by its corporate counsel Veach, that any maritime or common law lien it might assert would at most be applicable to charges that were already owed to it, and that even such a possible lien would be eliminated when payment was received. That being so, there is even less possible justification for Rose Marine and Smith in their having led ABB down the garden path to engage in forced legal work—a misleading course of conduct that they engaged in nine months later in Rose Marine's interrogatory answer and even later in Smith's April 1990 letter.

No less an authority than the Supreme Court teaches that the withdrawal of bootless claims does not insulate the pleader who has thrust work on the opponent by the original advancement of those claims. *Cooter & Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 2457, 110 L.Ed.2d 359 (1990) says that Rule 11 sanctions may still be imposed in that context because:

> Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay. Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred.

And lest there be any doubt that Rose Marine's discovery statement in its interrogatory answer (which was not filed in court by reason of this District Court's General Rule 18) can be the foundation for sanctions, Rule 26(g) sets the selfsame standard of prior investigation for such documents that Rule 11 does for the filing of pleadings.[15]

### Time Pressure

■ Finally Rose Marine tries to gain solace from the near-emergency that it says it had to confront when it filed the original Complaint—a factor that the case law takes into account in evaluating whether a party has met the objective good faith requirement of Rule 11 (see, e.g., *Mars Steel*, 880 F.2d at 932 and *Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1435 (7th Cir.1987), the latter identifying "the amount of time the attorney had to prepare the document and research the relevant law" as one of the relevant factors in determining whether the attorney made a reasonable prefiling inquiry as Rule 11 mandates). Rose Marine's corporate counsel Veach files an affidavit explaining that fast action was essential to lock up the coke before it could be offloaded from the barges.

But Veach's affidavit discloses that intensive prefiling legal work was not only possible but was actually done before this suit was brought. Veach Aff. ¶ 3 says that counsel undertook "as extensive an investigation as time permitted of the law applicable to ... various lien theories ... by having a number of lawyers work non-stop in the library right up to the point of filing the Complaint." Veach's Affidavit actually acknowledges the then-known unavailability of the lien claims to support the course of action that Rose Marine pursued, and that affidavit's other assertions (see n. 9) certainly do nothing to dispel the conclusion that this Court reached in the Opinion and that is renewed here about the *total* lack of arguable merit in the liquidated damages position that Rose Marine took.

In short, what Rose Marine has offered on the current motion tends to undercut rather than to support its attempted avoidance of Rule 11 liability. Its lawyers *did* have time to do the necessary prefiling legal work, and so there is simply no justification for any failure on their part to have uncovered and appreciated the significance of such authorities as *Stride* and *Callahan* in conclusively demonstrating the untenability of the claim that Rose Marine nevertheless asserted *and acted upon.*

### Conclusion

Rose Marine's Complaint and its later discovery response that has been referred to in this opinion violated the objective good faith requirement of prior investigation that is imposed by both Rule 11 and Rule 26(g). Both those Rules mandate the imposition of an appropriate sanction on Rose Marine. Here the appropriate sanction calls for making ABB whole by reimbursing it for the expense to which it was put in defeating Rose Marine's groundless claims by ABB's motion for summary judgment.

Where Rule 11 fee-shifting is involved, this Court most frequently encourages the parties to minimize (if not to eliminate entirely) any potential need for an evidentiary hearing by giving them the opportunity to confer and then report at an early status

---

**15.** ABB expressly relies on Rule 26(g) as well as on Rule 11. Because the standards established by the two rules are identical, this opinion will speak only of Rule 11 for the sake of simplicity.

hearing on what if any issues stand in the way of quantifying the attorneys' fees to be imposed on Rose Marine. This action is set for such a status report at 9 a.m. February 19, 1991 for that purpose.

766

## SONNENSCHEIN NATH & ROSENTHAL

8000 SEARS TOWER

CHICAGO, ILLINOIS 60606-6404

LOS ANGELES
NEW YORK
SAN FRANCISCO
ST LOUIS
WASHINGTON, DC

(312) 876-8000
TELEX 25-3526
FACSIMILE
(312) 876 7934

Alan S. Gilbert
(312) 876-7410

April 6, 1990

Mr. Terrance L. Smith
Smith & DeBonis
St. Catherine Professional Office Building
4230 Fir Street, Suite 411
East Chicago, Indiana 46312

    RE: Rose Marine Transportation v. Kaiser
        Aluminum and Chemical Corporation, et al

Dear Terry:

In our March 14, 1990 discovery conference, you agreed to provide us specific information about the liens Rose Marine relied upon in seizing ABB Trading (US), Inc.'s coke and any additional theories supporting that seizure other than the partnership, joint venture theory set forth in your reply to ABBTUS's counterclaim.

As you requested, on March 23, 1990 I wrote you a letter specifically requesting this information. Thereafter, you informed me orally that Rose Marine was relying on a maritime lien, a Louisiana common law warehouseman's lien and upon the lien provided in the Rose Marine/Kaiser agreement attached to your complaint. You also promised to send me a letter with that information.

To date we have not received a letter from you with the specific information about the liens or any other theories you may be relying upon. It is imperative that we obtain that information so that we may proceed with discovery in this matter. When doing so, please specify what type of a maritime lien you are relying upon and what provision in the Louisiana Civil Code provides the basis for the Louisiana lien.

                    Very truly yours,

                    SONNENSCHEIN NATH & ROSENTHAL

By:                      
              Alan S. Gilbert

ASG/ejb
9380D/9731960-0017
cc: F. Thomas Hecht
    Roger McFadden
bc: James Martin; Dennis Leuer; Lorie Chaitin

EXHIBIT C

# SMITH & DEBONIS
### ATTORNEYS AT LAW
ST. CATHERINE PROFESSIONAL OFFICE BUILDING
SUITE 411
4320 FIR STREET
EAST CHICAGO, INDIANA
46312

TERRANCE L. SMITH *
ANTHONY DEBONIS, JR.*
DENNIS F. SMITH
LAWRENCE M HANSEN

* ALSO ADMITTED IN ILLINOIS

TELEPHONE
(219) 398-3900

TELECOPIER (219) 398-4324

April 12, 1990

Mr. Alan S. Gilbert
Sonnenschein Nath & Rosenthal
Attorneys at Law
8000 Sears Tower
Chicago, IL 60606

Re:     Rose Marine Transportation, Inc. vs Kaiser

Dear Mr. Gilbert:

Sorry I have not responded to your earlier letter, but I will respond to your April 6, 1990 letter. I did not believe a reponse was necessary due to my amendment to CII's Interrogatory Number Two which states in part:

> ". . . the Plaintiff states that the security in which
> the Plaintiff maintained in the cargo was granted
> pursuant to the Agreement between Kaiser and RMT which
> was later assigned to LaRoche, and then assigned to
> CII/ABB. In addition to the security interest
> created by the contract which is the subject matter
> of this litigation, the Plaintiff contends that it
> has a lien on the goods transported and stored on
> RMT barges under maritime laW since the RMT barges
> were operating under contract in commerce and
> navigation. In addition, RMT has a warehouseman's
> lien on the goods stored in the RMT barges pursuant
> to the common law of the State of Louisiana."

### SMITH & DeBONIS

MR. ALAN S. GILBERT
April 12, 1990
Page Two

Should you have any questions, please do not hesitate to contact me.

Very truly yours,

SMITH & DeBONIS

TERRANCE L. SMITH

TLS/lap