Thomas S. KEDZIORA, et al., Plaintiffs,

v.

CITICORP NATIONAL SERVICES, INC., et al., Defendants.

No. 91 C 3428.

United States District Court, N.D. Illinois, E.D.

Feb. 24, 1994.

Daniel A. Edelman, Lawrence Walner, Chicago, IL, for plaintiffs.

Alan N. Salpeter, Terri A. Mazur, Victoria Collado, Mayer, Brown & Platt, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Thomas and Merrilou Kedziora ("Kedzioras"[1]) have sued Citicorp National Services, Inc. ("Citicorp"[2]), claiming that automobile leases issued by Citicorp have violated the Consumer Leasing Act, 15 U.S.C. §§ 1667–1667e (the "Act"[3]) and its implementing regulations.[4] Jurisdiction is grounded both in 28 U.S.C. § 1331 and in Section 1667d(c).

**1.** Although Merrilou's last name is now Channell, this opinion will continue to follow the practice of the litigants (and of this Court's earlier opinion) in using the collective term "Kedzioras" to refer to the two name plaintiffs.

**2.** This Court's initial opinion, referred to in the next paragraph of the text, employed the collective term "Citicorp" to refer to the current defendant and two of its then subsidiaries, Citicorp Acceptance Company, Inc. and Citicorp. This Court's July 15, 1992 oral ruling has since dismissed the latter corporation with the agreement of all parties, while what used to be Citicorp Acceptance Company, Inc. is now known as Citicorp National Services, Inc. (precisely what corporate change occasioned that is irrelevant for current purposes). Both for simplicity and for consistency with the earlier opinion, this opinion will continue to employ "Citicorp" to refer to the remaining defendant.

**3.** All citations to Title 15, whether or not part of the Act, will take the form "Section—."

**4.** In their original Complaint Kedzioras had also claimed that their Lease violated Illinois com-

This Court has earlier (in the "Opinion," 780 F.Supp. 516 (N.D.Ill.1991)) granted Citicorp's motion to dismiss as to much (though not all) of Kedzioras' original Complaint. What remains in the case, as now set forth in Kedzioras' Second Amended Complaint ("SAC"), are their contentions that Citicorp's leases allow it:

    1. to impose a penalty on early termination by inflating the depreciation component of the lease payments, while setting too small a figure for the interest component that is subject to credit or to rebate to the lessee (SAC ¶¶ 22–28),

    2. to collect unearned interest charges by using the Rule of 78's, also known as the Sum-of-the-Digits method, to calculate the amount of interest to be credited or rebated (SAC ¶¶ 29–30),[5] and

    3. to charge for greater than normal usage of leased cars by imposing excess mileage charges (SAC ¶¶ 31–32),

all in violation of Section 1667b(b). For its part Citicorp has brought a counterclaim demanding payment by Kedzioras of the remaining amounts allegedly due under Citicorp's lease agreement with Kedzioras (the "Lease"). And this Court (in a brief October 15, 1992 order) has granted Kedzioras' Fed. R.Civ.P. ("Rule") 23 motion for class certification.[6]

mon law and the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS §§ 505/1 to 505/12). But the current Second Amended Complaint charges only violations of the Act, so that no state law claims are before this Court.

**5.** For a detailed discussion relating to that method, see Opinion at 523–26.

**6.** That order defined the class as

All natural persons who (a) entered into a car lease primarily for personal, family or household purposes, which was assigned to Citicorp National Services, Inc. ("CNS") or Citicorp Acceptance Company, Inc. ("CAC"); (b) signed a lease agreement with the same early termination provisions as those in the Lease attached as Exhibit A to the plaintiff's complaint, for a duration exceeding four months, and for a total lease obligation not exceeding $25,000; (c) terminated (whether voluntarily or by default) their leases after May 6, 1990 but before the scheduled termination of their leases and returned their car or the insurance proceeds

Citicorp has now moved under Rule 56 for summary judgment against Kedzioras on their remaining claims and on its own counterclaim.[7] For the reasons set forth in this memorandum opinion and order, Citicorp's motion is denied.

### Facts

On September 1, 1988 Thomas Kedziora entered into the Lease for a 1989 Pontiac Grand Prix (the "Car") with a car dealer (the "Dealer"), and the Lease was assigned to Citicorp immediately after its execution (D. 12(m) ¶¶ 4–5). That assignment was expressly contemplated in the Lease, which states that its disclosures are made on behalf of Citicorp and that the Dealer intends to assign the Lease to Citicorp as soon as it is signed by the lessee (Lease introductory language; P. 12(n)(2) ¶ 10).

Dealer and Kedzioras agreed upon the selling price of the Car as $15,581.94, with Citicorp having no role in negotiating that amount (P. 12(m) ¶¶ 17, 22).[8] Under the Lease Kedzioras owed monthly lease payments that comprised both a depreciation component and an interest charge component (D. 12(m) ¶ 16):[9]

1. As for the depreciation component, that constitutes Citicorp's "cost of acquir-

ing the lease" less what was stated as the anticipated "Residual Value" of the car upon expiration of the Lease. In turn, Citicorp's cost was the sum of what it denotes as the "Selling price" ($15,581.94), the "Initial taxes" ($926.06) and the "Assignment fee" ($375)—a total of $16,883 (D. 12(m) ¶ 17). "Residual Value" was computed at 40% of the "Manufacturer's Suggested Retail Price" ("MSRP") of $15,-905—thus as $6,362 (D. 12(m) ¶ 20). Consequently the total depreciation component under the Lease was $16,883 less $6,362, or $10,521 (D. 12(m) ¶ 17). On an assumption of straight line depreciation over the Lease's 60–month term, the depreciation component of each monthly payment was $175.35 (*id.*).

2. As for the monthly interest charge (called the "lease charge" by Citicorp), that was determined by applying a "money factor" of 0.00445 to the sum of Citicorp's "cost of acquiring the lease" ($16,883) plus the "Residual Value" ($6,362)—a figure of $103.44 (D. 12(m) ¶ 23).

Each monthly payment thus amounted to $278.79—the sum of $175.35 and $103.44 (D. 12(m) ¶ 25).

Citicorp paid the Dealer $15,929.21 for the Lease, a figure derived by subtracting from what Citicorp terms its "gross capitalized

thereon to CNS or CAC; and (d) were assessed an early termination or default deficiency.

7. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). To implement Rule 56:

(a) This District Court's General Rule ("GR") 12(m) requires every Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each of those facts.
(b) GR 12(n) requires the nonmovant to respond point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

Both parties have tendered such statements. Citicorp's GR 12(m) statement will be cited "D. 12(m) ¶ —." Kedzioras' GR 12(n) response will be cited "P. 12(n)(1) ¶ —," and their statement of additional facts will be cited "P. 12(n)(2) ¶ —." Where Kedzioras have either explicitly or implicitly admitted any portion of Citicorp's GR 12(m) statement, this opinion will cite only to the latter.

8. Though Kedzioras purport to deny that, they refer to no evidence of any sort in support of that denial. Such a bald denial without evidentiary support is insufficient to raise a genuine issue of material fact, so that Citicorp's assertion is deemed admitted.

9. What follows in the text as to the computation of the various amounts is drawn from the "Dealer Worksheet" (Ward Aff.Ex. A), which Citicorp identifies as having been prepared by the Dealer, reviewed by Citicorp when it bought the Lease and then kept by Citicorp in the ordinary course of its business (D. 12(m) ¶ 15; Ward Aff. ¶ 5). Kedzioras make no response at all to that assertion, which is consequently deemed admitted (*Stewart v. McGinnis*, 5 F.3d 1031, 1033–35 (7th Cir.1993)).

cost" of $16,508 [10] the amounts that the Dealer had received directly from Kedzioras under the Lease—a security deposit of $300 and the first monthly payment of $278.79 (D. 12(m) ¶ 18). If Kedzioras had made all of the payments required under the Lease, they would have paid a total of $16,727.40—$10,521 allocable to depreciation and $6,206.40 in interest charges (D. 12m ¶ 26).

But on August 19, 1990 the Car was totally destroyed in an accident, an event that constituted a default and triggered the early termination of the Lease (D. 12(m) ¶¶ 6, 8). Early termination of the Lease required Kedzioras to pay an early termination charge made up of (Lease ¶ 17; D. 12(m) ¶ 9):

1. all past-due unpaid amounts;
2. all remaining monthly payments due on the Lease after the date of termination, reduced by both:
   (a) the unearned amount of interest calculated in accordance with the Rule of 78's and
   (b) all sales, use and rental taxes due on those remaining monthly payments;
3. the disposition charge;
4. the estimated wholesale value of the Car at the end of the originally-agreed-upon Lease term (the "Residual Value"); and
5. any government fees and taxes due in connection with the early termination of the Lease.[11]

(Lease ¶ 17; D. 12(m) ¶ 9).

In this instance Citicorp calculated a total early termination charge of $12,994.14 (D.

12(m) ¶ 11). For that purpose Citicorp used the actuarial method and *not* the Rule of 78's in determining the unearned portion of the interest charge, and it also did not include any excess mileage charges (D. 12(m) ¶¶ 12, 13). Because the total insurance proceeds credited to Kedzioras came to $10,306, according to Citicorp they remained personally liable for $2,688.14 (D. 12(m) ¶ 11).

### Statutory Language

■ Section 1667b(b) states:

Penalties or other charges for delinquency, default, or early termination may be specified in the lease but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the delinquency, default or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

As stated in Opinion at 519–20, that language was intentionally taken from and parallels the provisions of UCC § 2–718(1) and of Restatement (Second) of Contracts (the "Restatement") § 356(1) (1981) on liquidated damages. Given the silence of the Act and the implementing regulations as to the meaning of the term "reasonable," coupled with the Act's use of the phrase "anticipated or actual harm," it may fairly be concluded that Congress intended to look to the Restatement's explication of the latter phrase. That renders liquidated damages clauses enforceable if they provide a reasonable estimation of damages either anticipated at the time of

---

10. That figure, of course, is Citicorp's $16,883 "cost of acquiring the lease" less the $375 assignment fee.

11. Lease ¶ 17 reads in full:

VOLUNTARY EARLY TERMINATION. I [the lessee] may terminate this lease early after the first 12 months of the Lease term have passed if I am not in default and I first give you [the lessor] at least 30 days prior written notice. To terminate, I must return the leased vehicle to you and pay an early termination charge made up of the sum of: (a) all unpaid amounts then due under this Lease, (b) all remaining Monthly Payments due after the date I terminate this Lease reduced by the unearned amount of the Lease Charge (Item 28(a)) determined by the Sum-of-the-Digits method, and by the total amount of any sales, use or rental

tax (shown in item 24) for those Monthly Payments, (c) an amount equal to any disposition charge shown in Item 27, (d) the Estimated End of Term Wholesale Value of Vehicle shown in item 28, and (e) any government fees and taxes in connection with early termination of this Lease.
You will sell the leased vehicle at wholesale or retail as you determine and reduce the early termination charges by the money you receive from the sale of the leased vehicle or from insurance on it. I understand that under the termination charges described above I pay for the amount by which the Estimated End of Term Wholesale Value of Leased Vehicle exceeds the actual value you receive from sale at early termination.

contracting or suffered in fact at the time of breach (*Yockey v. Horn*, 880 F.2d 945, 952–54 (7th Cir.1989)).

### Kedzioras' Contentions

■ Kedzioras argue that the Lease calculations impose an unreasonable early termination charge in violation of Section 1667b(b) in two ways:

1. Lessees are charged for the remaining unrealized depreciation component and a "Residual Value," both of which are inflated above actual market rates, while they are credited only for whatever actual market value the car can fetch.

2. Citicorp's division between the depreciation and interest components of the Lease results in an arbitrarily small interest component credited to lessees.

Those contentions are wholly without merit, but it takes some elaboration of those arguments to cut through Kedzioras' misleading portrayal.

Kedzioras assert that the Lease contained an unreasonable early termination charge by inflating "the total depreciation" that the Car was "assumed to incur"—an amount that Kedzioras could be charged for only on early termination, but never on the originally scheduled termination (P.Mem. 4, 10–12). They offer the testimony of an "expert" that the total value of $16,883 assigned to the Car under the Lease[12] is almost $3,000 in excess of the Car's realistic retail selling price when new.[13] Upon scheduled termination the lessee who has made all the monthly payments suffers no harm from that differential—any "Residual Value" assigned to the car is irrelevant to his or her potential obligations under the Lease. By contrast, on early termination a lessee becomes liable for the total depreciation component of the remaining monthly payments (as of the date of early termination), from which Citicorp deducts the amount by which either (a) the actual market price received on resale (wholesale or retail at Citicorp's election) of the Car or (b) the insurance proceeds from the Car[14] exceed the "Residual Value" that was originally assigned to the Car.

Kedzioras argue that because the remaining depreciation component is a percentage of the inflated total value originally assigned to the Car, it too is inflated (that is, greater than the price the Car can realistically bring on resale), so that the difference constitutes a hidden "balloon" payment for those whose leases are terminated early. As Kedzioras phrase it, they are charged "for the difference between an above-retail price and a wholesale price" (P.Mem. 5).[15]

### Analysis of the Transaction

There is a special irony about this case. It is supposed to be about a lender's deceptive activity—its failure to disclose to the borrowers just what it is doing, a deception that assertedly manifests itself by collecting improper amounts when a transaction changes shape by shifting from a contemplated full-term loan to a premature termination. Yet it

---

12. Kedzioras needlessly introduce confusion into the discussion by characterizing that amount as "total depreciation." After all, "depreciation" in the context of this case logically refers to the depreciation component of the Lease—in this instance $10,521. Everyone would have been better served if Kedzioras had used some other term (perhaps "total assigned value") to describe the concept that they refer to as "total depreciation."

13. Kedzioras say that the "total depreciation" of the Car that they leased was $16,883—the same figure that has been discussed earlier as Citicorp's "cost of acquiring the lease" (D. 12(m) ¶ 17). Kedzioras' expert witness testified that the average consumer would have paid roughly $14,000 (presumably not including taxes) to purchase the same car (Sutton Dep. 137–39; Sutton Dep.Ex. 8, page A000029).

14. In Kedzioras' case there could be no "resale" because their Car had been destroyed, so that the amount credited was indeed the insurance proceeds. Kedzioras assert that because the insurance paid on the Car was based on what it was "in fact worth," that amount is the same as the price that the Car would have brought on an early termination sale. Citicorp does not contest that assertion.

15. That of course purportedly describes the situation as to class members other than Kedzioras themselves. In their case, as already stated, they were credited not with a "wholesale price" but rather with the amount of the insurance proceeds. But that difference does not alter the substance of Kedzioras' argument.

is really the borrowers, Kedzioras, who are being deceptive: Although they claim to be challenging only the reasonableness of the charge that is imposed on early termination (which is the only subject matter of Section 1667b(b)), a little reflection dispels the mathematical haze that they have created, disclosing instead that in doing so they are attacking either (1) the $16,883 total value assigned to the Car or (2) their having to bear the risk of any possible shortfall in the Car's value on early termination. But that first claim cannot be reached under Section 1667b(b), while the second has already been addressed in Opinion at 526–28 and was there found not to violate the Act.

No great level of mathematical sophistication is needed for the required analysis. All that one has to employ are the basic operations—addition, subtraction, multiplication and division—with an understanding (not necessarily by name) of such basic principles as the associative and commutative nature of those operations. On analysis it readily becomes apparent that Kedzioras' arguments, though posed in imperial (or imperious) fashion, have no clothes.

*Citicorp's Costs*

As already stated, the key to Kedzioras' position is the statement of its expert that what Kedzioras label as "total depreciation" ($16,883) was much too high (see n. 13). But that really reflects a social judgment about the operation of the free market in leasing automobiles—what is being argued by Kedzioras (through their expert) is that the cost of leasing a car is too high in relation to the cost of buying it for cash. After all, the fact (a fact that Kedzioras and their expert prefer to ignore) is that what Citicorp labels as its cost was *really* its cost—it is the amount that Citicorp actually paid to the Dealer (except for the addition of the legitimate and unchallenged $375 transfer fee).

There is nothing to suggest that Citicorp occupies a monopsony position in its car leasing operation (or even the buyer-side equivalent of an oligopolist's position). If persons in Kedzioras' position, who lack the necessary cash outlay for an outright purchase and who do not want for whatever reason to finance an outright purchase, are not satisfied with the alternative of making 60 payments of $278.79 each to acquire the use of a Pontiac Grand Prix for 5 years, after which they must turn the Car back to the lessor, the facts of economic life are that they either must look for another financing institution with better terms or (regrettably) must forgo getting a new car. Congress has targeted several aspects of consumer leasing in the Act, but one thing that it has *not* done is to establish any sort of regulatory price-fixing regime.

So the first step of the analysis is to recognize (as Kedzioras' counsel seek to gloss over) that Citicorp's cost is not only real but is invulnerable to attack under the Act because of some witness' notion of what is fair. It is a classic aphorism that public policy is an unruly horse [16]—but to the extent that it may properly be ridden, it is Congress (or perhaps the Supreme Court or, less frequently, some other court) that is permitted to mount the steed, and *not* someone such as Kedzioras' expert.

*Residual Value*

This figure, it must be remembered, simply represents the best estimate at the beginning of the Lease of one facet of Citicorp's anticipated return: the then-expected value of the vehicle at the end of 60 months. It is necessarily imprecise, and Kedzioras acknowledge that the method employed by Citicorp for that purpose (by simply taking 40% of MSRP) is reasonable. That then is an uncontested number.

*Depreciation Component*

When one impregnable number is subtracted from another equally impregnable number, the inevitable result is an impregnable remainder. In this instance the minuend

---

**16.** It is nearly a century and three-quarters since Mr. Justice Burrough said in *Richardson v. Mellish*, 2 Bing 229, 252, 130 Eng.Rep. 294, 303 (C.P.1824):

I, for one, protest ... against arguing too strongly upon public policy;—it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail.

(Citicorp's cost) less the subtrahend (Residual Value) leaves what has been termed the "depreciation component": the portion of Citicorp's capital investment that must be recaptured during the Lease term, so that Citicorp's receiving the vehicle on termination will provide it with a full recovery of capital.

Conversion of that "total depreciation component" into a monthly figure by dividing it by 60 is nothing more than a bookkeeping calculation. To the extent that it is unrealistic thus to treat depreciation (that is, the diminution in market value of the Car) as occurring ratably over the Lease term, that reality is taken into account by the recalculation that takes place when a lease is terminated midstream. More of this a bit later.

*Interest Charge*

Although Citicorp arrives at its "lease charge" by multiplying its cost-plus-Residual-Value by a constant factor, that must be understood as nothing more than a manufactured figure en route to establishing the amount of the monthly Lease payments—the amount that has real meaning both to Citicorp as the party providing capital and to lessees such as Kedzioras who pay for the use of that capital. In that sense, what is significant is not how the number is generated (in this instance by adding the straight-line depreciation component to the result of the multiplication described at the beginning of this paragraph), but rather the end result—$278.79 per month in Kedzioras' case.

*Early Termination*

It remains only to see how the just-reviewed set of numbers, each of them having been shown to be invulnerable to the fundamental criticism essayed by Kedzioras, plays out on the occasion of any early termination. At that point Citicorp's original expectation of a regular 60–month flow of funds (the

monthly payments, in this instance $278.79 each), followed by the return of the Car (in this instance having had the projected Residual Value of $6,362), has been changed by the event of termination in two respects:

1. All of the monthly payments for the future have been cut off (thus creating a loss for Citicorp in comparison with the expected benefit of its bargain).

2. Citicorp's future realization of the Car's end-of-Lease value has been accelerated by its current realization of a higher value (thus creating a gain for Citicorp in comparison with the originally anticipated benefit· of its bargain).

In purely economic terms, three components are needed to place Citicorp in a position equivalent to the one that it would have occupied but for the early termination:

1. Citicorp is entitled to receive the present value (discounted at the appropriate rate [17]) of what could have been the remaining monthly payments of $278.79.

2. It is also entitled to receive the similarly discounted present value of the originally anticipated Residual Value of $6,362.

3. It must give credit against the sum of those amounts for the amount that it has received for the Car, in this instance the insurance proceeds of $10,306.[18]

To the extent that Citicorp's Lease formulation differs from that, there may be at least a potential violation of Section 1667b(b).[19] But Kedziora's onslaught, grounded as it is on false premises, bears no resemblance to the realities of the law of penalties. It is rejected in its entirety.

To pursue the proper analysis instead, what Citicorp has done in Lease ¶ 17 is to reduce the first component (the stream of future payments) by the unearned interest portion of those payments, calculated in actuarial terms. Although this Court has not

---

**17.** For a brief discussion of present-value discount rates, including references to the leading authorities, see this Court's opinion in *Marcing v. Fluor Daniel, Inc.,* 826 F.Supp. 1128, 1138 (N.D.Ill.1993).

**18.** Opinion at 526–28 has explained at some length why the Lease's use of the actual proceeds of resale (or in this instance insurance proceeds) on early termination is reasonable within the

meaning of Section 1667b(b). Nothing submitted on the current motion suggests any need to reexamine that analysis or its conclusion.

**19.** See, e.g., this Court's opinion in *Heller Financial, Inc. v. Burry,* 633 F.Supp. 706, 707 (N.D.Ill. 1986), relying on our Court of Appeals' opinion in *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1290 (7th Cir.1985).

crunched the numbers (nor have the litigants), that would seem a reasonable approach (again reasonableness is the standard under Section 1667b(b)) to the discounting of the full stream of payments to their present value. As for the third component, Citicorp has of course properly credited the Kedzioras for the full insurance proceeds. Hence all that Citicorp has done that appears potentially vulnerable under the Act relates to the second component—to its having collected the entire Residual Value of $6,362, rather than only the somewhat lower present value of that amount.

That then is the only unresolved factor that blocks summary judgment in Citicorp's favor. At this stage this opinion has done enough of the litigants' work of analysis for them. Accordingly, this Court awaits the parties' further input as to how the entire Lease ¶ 17 formulation works out in relation to the mandate of Section 1667b(b).

### Interest Credit Calculation

■ Lease ¶ 17 expressly calls for the use of the Rule of 78's to calculate the unearned portion of the interest component that is attributable to future Lease payments (the amount that gets credited to the lessee on early termination). SAC ¶¶ 29 and 30 describe the Rule of 78's as "a mathematical device or gimmick that consistently disfavors the consumer" in contrast to the "actuarial method" used by other leasing companies that "calculates the cost of money for the actual period of time it is used." Despite the language of the Lease, Citicorp in fact made an actuarial calculation rather than using the Rule of 78's in figuring Kedzioras' liability (D. 12(m) ¶ 12).

Kedzioras attack that substitution as impermissible, arguing that Citicorp cannot "unilaterally substitute a . . . liquidated damages formula" different from that specified in the Lease. Kedzioras then go on to cite authority for the proposition that when a liquidated damages clause is held unenforceable, only actual damages are allowed.[20] Effectively Kedzioras insist that Citicorp must adhere to the Lease's invocation of the Rule of 78's, so as to preserve Kedzioras' claim against Citicorp stemming from its use of that method.

Thus this Court is presented with the oddity of a defendant that is willing to concede one aspect of plaintiffs' claims and to afford plaintiffs the requested relief in that respect, only to encounter stubborn resistance—an outright refusal—from plaintiffs. One clue to that bizarre situation may be Kedzioras' desire to taint (and to render uncollectible) the entire early termination charge in the manner that it is framed in the Lease, even though they can point to only some portion of that charge as problematic. What seems another likely reason for Kedzioras' argument is the desire of their counsel to assert a position that might benefit the plaintiff class[21] even though it might not help Kedzioras (this would not be the first time that this Court has encountered class counsel who become preoccupied with global issues that are of no import to their class representatives—and who, by doing so, may actually cut against the interests of those in-person clients).

In this case, however, the approach already taken by this Court obviates any need to consider such arcane mysteries as whether Citicorp's willingness to cave in on the Rule of 78's issue, by thus eliminating any threat of enforcement of that provision against Kedzioras, deprives them of any Article III case or controversy status on that issue (cf. *Young v. Lane*, 922 F.2d 370, 373–74 (7th Cir.1991); *Madyun v. Thompson*, 657 F.2d 868, 872–73 (7th Cir.1981)). This opinion has already held that Citicorp must reduce the lost future

---

**20.** Lest there be any misunderstanding on the subject, the ruling announced in the preceding section of this opinion plainly reflects a permissible view of Citicorp's actual damages. But in light of the language of Section 1667b(b), which speaks in terms of what is "reasonable" rather than in absolute terms, it is at least conceivable that a calculation less favorable to Kedzioras also might not run afoul of the statutory prohibition. Lacking input from the parties on that score,

however, this Court cannot now address that possibility.

**21.** Citicorp has not said whether or not it has abandoned the Rule of 78's in favor of an actuarial calculation not only as to Kedzioras but also as to *all* of its lessees who are included within the class.

stream of Lease payments to their present value, and if the actuarial calculation of unearned interest accomplishes that result Kedzioras cannot be heard to complain.

### Excess Mileage Charges

Citicorp has correctly pointed out that no excess mileage charges were assessed against Kedzioras under the Lease, thus depriving them of any standing to challenge the reasonableness of that Lease provision. Kedzioras concede that fact (as they must). That defeats Kedzioras' effort to raise the issue both for themselves *and* in a representative capacity, but the dismissal of their claim on that ground obviously has no impact on any member of the class who *has* been required to pay such charges.

### Citicorp's Counterclaim

Citicorp has also moved for summary judgment on its Counterclaim for the remaining $2,688.14 that it claims Kedzioras owe it under the Lease terms. But the same issue that has precluded summary judgment on Kedzioras' claim—the need to inquire further as to the reasonableness of Citicorp's early termination charge—bars summary judgment on Citicorp's Counterclaim.

### Conclusion

Material factual issues stand in the way of both facets of Citicorp's summary judgment motion. That motion must be denied, at least for the present. This action is set for a status hearing at 8:45 a.m. March 7, 1994 to discuss further proceedings.